IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

STATE OF WASHINGTON,      )     No. 31187-2-III
     )     (consolidated with
     Respondent,      )     No. 31188-1-III
     )     No. 31205-4-III
     v.      )     No. 31225-9-III)
     )
JOSE JESUS MANCILLA,      )
     )
     Appellant.      )
     )
_____ )
     )
STATE OF WASHINGTON,      )
     )
     Respondent,      )
     )
     v.      )
     )
ARMANDO LOPEZ,      )     PUBLISHED OPINION
     )
     Appellant.      )
     )
_____ )
     )
STATE OF WASHINGTON,      )
     )
     Respondent,      )
     )
     v.      )
     )
JAIME LOPEZ,      )
     )
     Appellant.      )
     )
_____ )

No. 31187-2-III; 31188-1-III; 31205-4-III; 31225-9-III
*State v. Mancilla*

STATE OF WASHINGTON,          )
                              )
                Respondent,   )
                              )
    v.                        )
                              )
NICHOLAS JACOB JAMES,         )
                              )
                Appellant.    )

PENNELL, J. — In the context of a criminal trial, gang evidence is a double-edged sword. On the one hand, such evidence can help jurors understand relationships between defendants and how various symbols and terminology suggest motive and intent. But on the other hand, gang evidence can be problematic. Merely suggesting an accused is a gang member raises the concern he or she will be judged guilty based on negative stereotypes as opposed to actual evidence of wrongdoing. Accordingly, the State's use of gang evidence requires close judicial scrutiny.

The State's gang evidence here largely stands up to our review. The objective evidence suggested the defendants' crime was gang related, and the State presented narrowly tailored gang evidence to support its theory of the case. The State did err in introducing the defendants' booking statements where they admitted gang affiliation. *State v. Juarez DeLeon*, 185 Wn.2d 478, 374 P.3d 95 (2016). However, with the

2

exception of Jaime Lopez, this error was rendered harmless by other independent evidence of admitted gang affiliation.

Because neither gang related evidence nor other alleged errors impacted the convictions of Jose Mancilla, Armando Lopez, and Nicholas James, those results are affirmed. Only Jaime Lopez's conviction was compromised by impermissible gang evidence. Accordingly, Jaime Lopez's conviction is reversed without prejudice and remanded for retrial.

## BACKGROUND

This case involves a Yakima County drive-by shooting. The facts are strikingly similar to another Yakima County drive-by shooting recently addressed by the Supreme Court in *Juarez DeLeon*. The target of this shooting was the Rincon house. Although several people were inside the house at the time of the shooting, no one was hurt. When law enforcement arrived to investigate the shooting, blue graffiti could be seen near the home's entrance. Law enforcement also recovered spent ammunition and a rifle magazine from the scene.

This was not the first time the Rincon house had been fired upon. It had been targeted four or five times in the past, presumably because two of the household members were affiliated with the Norteños gang.

3

On the morning of the shooting, two women were delivering newspapers in the area. After hearing the shots, they noticed a vehicle coming from the direction of the Rincon house. The vehicle had its headlights off and turned in front of their car. The women called the police and identified the vehicle as a gray Mitsubishi Galant.

A responding deputy saw a vehicle matching the women's description stop at an intersection. The deputy turned to pursue the vehicle, eventually stopping it. He removed four individuals from the vehicle, driver Armando Lopez, front seat passenger Jose Mancilla, and back seat passengers Jaime Lopez and Nicolas James. The deputy noted Armando Lopez had a blue bandana hanging from his neck. No firearms or ammunition were found inside the vehicle. Suspicious that firearms may have been discarded prior to the stop, officers went back to the intersection where the deputy first saw the Mitsubishi Galant. Three firearms were located in the area. A later forensic examination confirmed the three firearms matched the ammunition and magazine found at the Rincon house.

At the police station, law enforcement took the defendants' photographs. Armando Lopez is depicted "throwing up a gang sign." Ex. 68; 5 Report of Proceedings (RP) (Sept. 6, 2012) at 497-98. Law enforcement also took pictures of his many tattoos, including the number 13. The photograph of Jaime Lopez shows numerous tattoos, including a forearm tattoo of a zip code and the number 13 tattooed on his shoulders.

4

Nicolas James is pictured wearing a blue shirt with a blue belt; his belt buckle prominently featuring the number 13. Both the color blue and the number 13 are associated with the Sureños gang.

After being read their *Miranda*[1] rights and invoking their right to remain silent, the four defendants were booked into jail. During the booking process, a corrections officer questioned the defendants about gang affiliation in order to ensure they were safely housed. In response to that questioning, all four men admitted they were Sureños. Armando and Jose specifically identified themselves as members of Little Valley Locos or Lokotes (LVL), a Sureño clique.

The State charged the four men with seven counts of first degree assault and one count of drive-by shooting, all carrying gang aggravators. The seven counts of first degree assault also carried up to three potential firearm enhancements per count. In addition, the State charged Jose Mancilla, Armando Lopez, and Nicolas James with one count of first degree unlawful possession of a firearm, also carrying a gang aggravator.

The four defendants were tried together. At trial, the State introduced the defendants' booking statements acknowledging gang membership. In addition, the State introduced recorded jail phone calls where Jose Mancilla and Nicolas James implicated

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

themselves as members of LVL. The State also called Officer Jose Ortiz as a gang

expert. Officer Ortiz testified about the meaning of gang terminology and symbols, the

types of criminal activities in which gangs were involved, gang codes of conduct and

discipline of violators, gang interactions with other gangs, the hierarchy of gang

membership, and how to achieve status within a gang. He also testified Armando Lopez

is a member of LVL.

The jury found the defendants guilty as charged. Following a motion to arrest

judgment, the trial court dismissed the gang aggravators. The court sentenced Jose

Mancilla and Nicolas James to consecutive sentences for the seven counts of first degree

assault and imposed the three firearm enhancements per count consecutively, for a total

sentence of 1,956 months. The court sentenced Armando Lopez, a persistent offender, to

life in prison without the possibility of release. The court sentenced Jaime Lopez to

consecutive sentences for the seven counts of first degree assault and imposed the three

firearm enhancements per count consecutively, for a total sentence of 1,929 months.[2] All

four defendants appeal.

---

[2] All sentences imposed for the convictions for the drive-by shooting and first degree unlawful possession of a firearm ran concurrently to the above-enumerated sentences.

ANALYSIS OF TRIAL CLAIMS

*Fifth Amendment challenge to booking statements*

The trial court erred in admitting the defendants' jail booking statements regarding

gang affiliation. *Juarez DeLeon*, 185 Wn.2d at 487. Because the statements were made

to ensure the defendants' personal safety, they cannot be used as adverse evidence at trial.

*Id.*

While the State committed constitutional error in admitting the defendants'

statements, reversal is not automatic. When faced with a constitutional error, we apply a

harmless error test. *Id.* The State must prove the erroneously admitted evidence was

harmless beyond a reasonable doubt. Under this level of scrutiny, we examine whether

"'*any reasonable jury* would have reached the same result, despite the error.'" *Id.*

(quoting *State v. Aumick*, 126 Wn.2d 422, 430, 894 P.2d 1325 (1995)).

Application of the harmless error analysis to this case is guided by the factually

similar case of *Juarez DeLeon*. At trial in *Juarez DeLeon*, the State had presented

substantial gang affiliation evidence, apart from booking statements. The evidence

included gang related clothing and tattoos. Witnesses also testified about the defendants'

past gang affiliations. While this evidence would seem substantial, *Juarez DeLeon* held it

was insufficient to meet the State's burden. As explained by the court, "[t]he strongest

7

evidence that a person is a gang member is their own clear admission." *Juarez DeLeon*,

185 Wn.2d at 488. Because the State had no such evidence, apart from the improperly

admitted booking statements, the *Juarez DeLeon* court reversed the defendants'

convictions.

In light of *Juarez DeLeon*, we focus on whether the State presented evidence of the

defendants' admitted gang affiliation, apart from their booking statements. Such

evidence exists for three of the four defendants. With respect to Armando Lopez, the

State introduced a postarrest photo in which Armando Lopez displayed a gang related

hand sign. While not verbal, this was an unambiguous admission of current gang

membership. The State also introduced incriminating jail calls from Jose Mancilla and

Nicholas James. During Jose Mancilla's recorded call, he identified himself as "Solo"

from the LVL gang. 7 RP (Sept. 10, 2012) at 773, 776. During Nicholas James's call, he

identified himself by the name "Little Rascal." *Id.* at 774, 777. This testimony was

significant because Armando Lopez's gang name was "Rascal." *Id.* at 796. According to

the State's gang expert, using the adjective "Little" denotes an individual as a mentee of a

named gang member. 8 RP (Sept. 11, 2012) at 857. Referring to himself as "Little

Rascal" was an acknowledgment by Mr. James of his status as the mentee of Armando

Lopez, whose gang name was "Rascal." While indirect, Mr. James's statement served to

8

identify himself as a gang cohort. Admission of this statement to the jury was sufficient

for the State to meet its burden of overcoming *Juarez DeLeon* error.

Our analysis with respect to Jaime Lopez is much different. Other than Jaime

Lopez's booking statements, the State did not present any evidence of admitted gang

affiliation. Jaime Lopez was not involved in any recorded jail calls. He was not

photographed throwing a gang sign or wearing gang related clothing.[3] The only evidence

suggesting Jaime Lopez's gang affiliation was his tattoos. Yet *Juarez DeLeon* held that

gang tattoos, even if accompanied by other indicia of gang membership, is insufficient to

overcome the taint of an inadmissible booking statement. Thus, nothing about Jaime

Lopez's words or appearance is sufficient to take his case outside the holding of *Juarez

DeLeon*.

The only possible distinction between *Juarez DeLeon* and this case is the fact that

the State has been able to meet its harmless error burden as to Jaime Lopez's

codefendants. The question then becomes whether the combination of Jaime Lopez's

tattoos and his presence in a vehicle shortly after a drive-by shooting with three admitted

---

[3] During oral argument, counsel for the State proffered that Jaime Lopez was wearing a blue "wild west" style bandana. Wash. Court of Appeals oral argument, *State v. Lopez*, No. 31188-1-III (Oct. 20, 2016) at 27 min., 35 sec. to 28 min., 20 sec. (on file with court). However, the record does not bear this out. The testimony at trial was the "wild west" bandana pertained to Armando Lopez. 5 RP (Sept. 6, 2012) at 470-71.

9

gang members is sufficient to overcome the taint of the *Juarez DeLeon* error. We hold it

is not. The jury was presented with evidence suggesting only three individuals were

involved in the drive-by shooting. Three guns were found near the scene of the crime, not

four. And when Nicholas James discussed his gang affiliated codefendants, he mentioned

only Armando Lopez (Rascal) and Jose Mancilla (Solo). He did not mention Jaime

Lopez. While the State presented significant evidence of Jaime Lopez's involvement, it

was not sufficiently strong to meet the difficult burden of establishing harmless error

beyond a reasonable doubt. Jaime Lopez's convictions are therefore reversed pursuant to

*Juarez DeLeon.*

## Gang expert testimony

The defendants challenge Officer Ortiz's expert testimony regarding gang

affiliation and gang related activity. They argue the evidence constituted improper

propensity evidence under ER 404(b) and was prejudicial under ER 403. They also claim

the testimony did not meet the standards for admission as expert testimony under ER 702.

We review the trial court's evidentiary rulings for abuse of discretion. *State v. Asaeli,*

150 Wn. App. 543, 573, 208 P.3d 1136 (2009). The defendants bear the burden of proof

in this context. *Id.*

10

ER 404(b) prohibits a court from admitting "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Because it is a limitation on "*any* evidence offered to 'show the character of a person to prove the person acted in conformity' with that character at the time of a crime," it encompasses gang affiliation evidence that a jury may perceive as showing a law breaking character. *State v. Foxhoven*, 161 Wn.2d 168, 174-75, 163 P.3d 786 (2007) (quoting *State v. Everybodytalksabout*, 145 Wn.2d 456, 466, 39 P.3d 294 (2002)).

Given the inherent prejudice of gang evidence, the State's decision to introduce gang expert testimony is a risky one. *Id.* Generalized expert testimony on gangs, untethered to the specifics of the case on trial, is impermissible. *Juarez DeLeon*, 185 Wn.2d at 490-91. But gang expert testimony can also be quite helpful. It can assist in establishing a motive for a crime or showing the defendants were acting in concert. *Id.* at 490; *State v. Scott*, 151 Wn. App. 520, 527, 213 P.3d 71 (2009). It may also help explain a witness's reluctance to testify. *Id.* at 528.

This is a case where gang expert testimony was helpful. Officer Ortiz's testimony supported the State's theory of motive and explained why the defendants, as members of the Sureño affiliated LVL gang, would seek to target a house affiliated with Norteños. The testimony also explained why the jury should believe the four defendants were acting

11

in concert as opposed to the possibility that one or more were merely innocent associates. Finally, the gang testimony explained why certain witnesses from the Rincon household might fear reprisal and be reluctant to testify.

The relevance of Officer Ortiz's testimony outweighed the risk of undue prejudice. The State did not present Officer Ortiz's testimony simply in an effort to portray the defendants as bad people. The objective evidence, including the blue graffiti left on the Rincon house and the colors worn by the defendants at the time of arrest, provided the State with ample reason to believe the assault on the Rincon house was gang related. Officer Ortiz's testimony appropriately supplied the jury with the tools necessary to interpret this evidence and understand the State's theory of the case.

Nor was Officer Ortiz's testimony overly general. The vast majority of Officer Ortiz's comments were directly linked to the specifics of the defendants' case. At one point, Officer Ortiz did testify to general criminal activities by gangs, such as "disorderly conduct, drinking, vehicle prowls, thefts, robberies, shooting, homicides, assaults." 8 RP (Sept. 11, 2012) at 855. This testimony might be characterized as general. However, it was not particularly prejudicial, especially given the testimony by nonlaw enforcement witnesses that the Rincon house had been the target of numerous drive-by attacks, including one which resulted in death. The least specific aspect of Officer Ortiz's

12

testimony, which involved a discussion of how gang leaders issue orders from prison and how new members are jumped into a gang, was elicited on cross-examination. Because this testimony was not elicited by the State, it is not something the defendants can now challenge on appeal.

Apart from the objections to the relevance of gang expert testimony under ER 404(b) and 403, the defendants also challenge the nature of the State's gang expert testimony under ER 702. Specifically, the defendants claim Officer Ortiz's testimony failed to supply any information outside the realm of common knowledge.[4] They contend it was not a proper subject for presentation to the jury under the guise of an expert witness.

The defendants' arguments regarding the quality of information supplied by Officer Ortiz run counter to their claims of prejudice. To the extent Officer Ortiz simply provided commonly understood information about gangs, it is difficult to understand how his testimony could be prejudicial. But in any event, we disagree that Officer Ortiz's

---

[4] The defendants also claim Officer Ortiz's testimony constituted an impermissible comment on the defendants' guilt. However, none of the defendants timely and specifically objected to Officer Ortiz's testimony on the grounds it constituted an opinion regarding their guilt. They objected solely on the grounds the proposed testimony was a matter of common knowledge and constituted propensity evidence. Their failure to specifically object bars them from claiming error. RAP 2.5(a); *State v. Embry*, 171 Wn. App. 714, 741, 287 P.3d 648 (2012).

testimony was so bland it failed to be useful and meet the criteria for admission under ER 702. While it may be common knowledge that rival gangs engage in violence against each other, this was not the full extent of Officer Ortiz's testimony. Officer Ortiz explained the meaning of gang terminology and symbols, the types of criminal activities in which gangs are involved, gang codes of conduct and discipline of violators, gang interactions with other gangs, the hierarchy of gang membership, and how a member achieves status within the gang. This was technical information, important to the State's theory of the case. It was therefore the proper subject for expert testimony.

*Jury instruction challenges*

The defendants challenge three of the court's jury instructions: (1) the "to convict" instruction regarding first degree assault, (2) the transferred intent instruction, and (3) the accomplice liability instruction. They also argue the State presented insufficient evidence to meet the terms of the "to convict" instruction. We review the court's jury instructions de novo. *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). Instructions are flawed if, taken as a whole, they fail to properly inform the jury of the applicable law, are misleading, or prohibit the defendant from arguing their theory of the case. *State v. Tili*, 139 Wn.2d 107, 126, 985 P.2d 365 (1999). In our review of the defendants' sufficiency challenge we view the evidence in the light most favorable to the State and ask whether

14

any rational trier of fact could have found guilt beyond a reasonable doubt. *State v.*

*Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

*"To convict" instruction*

A "to convict" instruction is an instruction that apprises the jury of the elements of

an offense. In relevant part, the court's "to convict" instruction for first degree assault

states:

> To convict the defendant of the crime of First Degree Assault in
> Count [x], each of the following elements of the crime must be proved
> beyond a reasonable doubt:
>
> (1) That on or about March 14, 2011, the defendant or an
> accomplice assaulted [specific person];
> (2) That the assault was committed with a firearm;
> (3) That the defendant or an accomplice acted with intent to inflict
> great bodily harm; and
> (4) That this act occurred in the State of Washington.

Clerk's Papers (CP) at 61.[5] According to the defendants, this instruction was inadequate

because it failed to clarify the State's burden to prove specific intent.

The crime of first degree assault requires proof of four elements—that the

defendant, (1) with intent to inflict great bodily harm, (2) assaulted (3) another (4) with a

---

[5] This instruction mirrors the language of the pattern jury instruction, 11
*Washington Practice: Washington Pattern Jury Instructions: Criminal* 35.02, at 453 (3d
ed. 2008) (WPIC).

15

firearm. *State v. Elmi*, 166 Wn.2d 209, 214-15, 207 P.3d 439 (2009); *see also* RCW 9A.36.011(1)(a). The nature of the defendant's intent is an important aspect of a court's instructions on first degree assault. First degree assault requires the State to prove the defendant intended a specific result; i.e., the infliction of great bodily harm. *Elmi*, 166 Wn.2d at 216. It is not sufficient merely to prove the defendant intended to act in a way likely to bring about the specific result. If the jury instructions fail to make this distinction, they are inadequate. *State v. Byrd*, 125 Wn.2d 707, 716, 887 P.2d 396 (1995).

Contrary to the defendants' arguments, the instructions here did not misstate the requisite form of intent. The third prong of the instruction unambiguously required the State to prove intent to accomplish the result required by statute. There was no reasonable basis for jury confusion on this point.

The court's instructions were not required to specify that the defendants intended to harm a specific person or persons. While the State certainly can present proof of intent to harm a specific person, doing so is unnecessary. All the statute requires is proof the defendant intended to inflict great bodily harm on *someone*, even if that someone is unknown. *Elmi*, 166 Wn.2d at 218 ("Where a defendant intends to shoot into and to hit *someone* occupying a house, a tavern, or a car," a conviction for first degree assault will stand) (emphasis added). The instructions here met this standard.

16

*Specific intent matching specific victims*

Apart from the legal adequacy of the "to convict" instructions, the defendants claim the instructions, as worded, required the State to prove intent to assault a specific person. Because no proof was presented at trial that the defendants knew who was inside the Rincon house, the defendants claim the State presented insufficient evidence to support their convictions.

We disagree with the defendants' reading of the instructions. The instructions for each count did specify different victims. But this was only to ensure separate findings. This was important because even though a defendant's generalized intent to harm one or more persons is sufficient to establish the mens rea of first degree assault, proof that an actual person was in fact assaulted is necessary to complete the crime. *See State v. Abuan*, 161 Wn. App. 135, 158-59, 257 P.3d 1 (2011). Without an individual victim, there is no assault. The instructions here appropriately separated the defendant's intent from the identity of the victim. Because there was no link between these two components, the State's failure to prove intent to harm specific victims was inconsequential.

*Sufficiency of the evidence*

Our disagreement with the defendants' interpretation of the law and instructions

17

disposes of the majority of their claims that the State presented insufficient evidence to satisfy the terms of the "to convict" instructions. One issue remains: whether the State produced sufficient evidence for the jury to find the defendants intended to harm *someone* as opposed to simply shoot at an empty house. Although proof as to a specific victim is not required, the defendants are correct that the State must prove the defendants intended harm to an actual person.

In satisfying its burden of proving intent, the State is entitled to rely on circumstantial evidence. Relevant factors may include the manner in which an assault is committed and the nature of any prior relationship between the alleged assailant and victim. *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994).

The evidence here showed the shooting took place at 4:00 a.m. on a Monday. Several cars were parked outside the Rincons' small, single-wide trailer home. Faced with these circumstances, the defendants could be expected to know the house they were shooting at was occupied. In addition, given the home's small size, the defendants would also know injuries were likely. These circumstances permitted the jury to find the requisite degree of intent. *Cf. State v. Ferreira*, 69 Wn. App. 465, 469, 850 P.2d 541 (1993) (evidence insufficient to support first degree assault when it was only "likely apparent" that a house was occupied). The State satisfied its burden of proof.

18

*Transferred intent jury instruction*

Apart from the "to convict" instruction, the defendants challenge the court's transferred intent instruction. The instruction reads as follows:

> If a person assaults a particular individual or group of individuals with a firearm with the intent to inflict great bodily harm and by mistake, inadvertence, or indifference, the assault with the firearm took effect upon an unintended individual or individuals, the law provides that the intent to inflict great bodily harm with a firearm is transferred to the unintended individual or individuals as well.

CP at 60.

The defendants' primary argument is the transferred intent instruction relieved the State of its burden to prove mens rea. They argue the use of the words "mistake, inadvertence, or indifference" suggests the lower mental states of recklessness or negligence substitute for intent. We disagree. The court's instruction clearly lays out the intent needed for first degree assault: "the intent to inflict great bodily harm." *Id.* The instruction then uses a conjunctive "and" to state intent can be transferred to an unintended victim by mistakenly, inadvertently, or indifferently assaulting an unintended person. The words "mistake, inadvertence, or indifference" only apply to the identity of the victim, not to the intent. The instruction does not conflate mental states and is not confusing.

19

The defendants also argue the transferred intent instruction was unnecessary. Regardless of whether this is true, relief is unwarranted. The transferred intent instruction may have been superfluous given the "to convict" instruction. However, inclusion of the instruction did not negatively impact the defendants, especially where the defense did not involve intent but rather identity. *See State v. Salamanca*, 69 Wn. App. 817, 827, 851 P.2d 1242 (1993).

*Accomplice liability instruction*

The final instructional challenge goes to the court's accomplice liability instruction, which reads as follows:

> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he either:
>
> > (1) solicits, commands, encourages, or requests another person to commit the crime; or
> > (2) aids or agrees to aid another person in planning or committing the crime.
>
> The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person is an accomplice.
>
> A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

20

CP at 2296.[6]

The defendants claim this instruction was confusing and included erroneous language that mere presence was sufficient to give rise to accomplice liability. We find no error. The instruction unambiguously informed the jury the State was required to prove more than mere presence. By distinguishing mere presence and requiring proof the defendant knew his conduct would promote or facilitate the commission of a crime, the instruction appropriately apprised the jury that the State must prove more than the defendant was a knowing observer of a crime. No error was committed in issuing the instruction.

*Public trial*

Nicolas James contends the trial court violated his right to a public trial by allowing the trial to continue past 4:00 p.m. on several days when a sign on the courthouse door indicated the courthouse closed at 4:00 p.m. His argument is foreclosed by the Washington Supreme Court's decision in *State v. Andy*, 182 Wn.2d 294, 340 P.3d 840 (2014).

_____

[6] This instruction is identical to the language from the Washington Pattern Jury Instructions. WPIC 10.51, at 217. It is also drawn directly from the accomplice liability statute, RCW 9A.08.020.

21

ANALYSIS OF SENTENCING CLAIMS

*Firearm enhancement*

Jose Mancilla contends the trial court had no authority to "stack" the three firearm enhancements. Br. of Appellant at 14. He argues that there should have been a 60-month enhancement for each count of first degree assault instead of a 180-month enhancement for each count. The Washington Supreme Court specifically addressed this argument in *State v. DeSantiago*, 149 Wn.2d 402, 415-21, 68 P.3d 1065 (2003), holding "the plain language of [RCW 9.94A.533][7] requires a sentencing judge to impose an enhancement for *each* firearm or other deadly weapon that a jury finds was carried during an offense." *Id.* at 421 (emphasis added). Here, the jury found Mr. Mancilla carried three separate firearms for each of the seven counts of assault. Thus, the court properly imposed an enhancement for each of the three firearms.

*Constitutionality of the Persistent Offender Accountability Act*

Armando Lopez claims his life sentence under the Persistent Offender Accountability Act, RCW 9.94A.030 and .570, was imposed in violation of his rights to due process, equal protection and to a jury trial. His arguments are contrary to our case

---

[7] The *DeSantiago* court analyzed RCW 9.94A.510. The language at issue there has now been recodified in RCW 9.94A.533.

law. *State v. Witherspoon*, 180 Wn.2d 875, 892-94, 329 P.3d 888 (2014); *State v. Brinkley*, 192 Wn. App. 456, 369 P.3d 157, *review denied*, 185 Wn.2d 1042, 377 P.3d 759 (2016); *State v. Williams*, 156 Wn. App. 482, 496-98, 234 P.3d 1174 (2010).

## CONCLUSION

The judgments and sentences of Jose Mancilla, Armando Lopez, and Nicholas James are affirmed. Jaime Lopez's conviction is reversed without prejudice, and his case is remanded for further proceedings, consistent with this opinion.

_____
Pennell, J.

WE CONCUR:

_____    _____
Lawrence-Berrey, A.C.J.    Siddoway, J.