## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32867-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JUAN ANDRES RODRIGUEZ, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Juan Rodriguez appeals his convictions for attempted

first degree murder and first degree assault. He argues the trial court committed

reversible error in three respects: (1) when it admitted expert gang testimony, (2) when it

admitted his statements to jail staff during booking that he was affiliated with the Sureño

gang, and (3) when it assessed discretionary legal financial obligations (LFOs) against

him. We conclude the trial court did not err in admitting expert gang testimony, the error

in admitting Rodriguez's booking statements was harmless beyond a reasonable doubt,

and we decline to review Rodriguez's unpreserved LFO argument.

FACTS

On June 24, 2012, Mario Cervantes, Jr., was driving his father's Cadillac Escalade in Toppenish, Washington. He stopped to give his friend Angel Arredondo a ride from a barbecue to Arredondo's house. As they were driving past Toppenish Community Hospital, a Nissan sedan pulled up on the left side of the Escalade. A passenger in the Nissan fired several gunshots into the Escalade. One bullet struck Cervantes in his flank area. Arredondo caught a quick glance of the Nissan and saw two or three people inside of it.

The Nissan passed the Escalade and stopped at a stop sign. Cervantes stepped on the accelerator and rear ended the Nissan. Cervantes then drove around a parking lot to pick up speed and rammed the Nissan again on the driver's side door, pushing the Nissan into a nearby house. Cervantes and Arredondo then jumped from the Escalade and ran toward the nearby hospital. Cervantes went inside the hospital for treatment. He was wearing a red and black Chicago Bulls jersey, which was later collected as evidence. A nurse inside the hospital called the police.

Cervantes's father was inside a nearby house and heard the gunfire and the collision. He went outside and saw his son and Arredondo running toward the hospital. He also saw two other men running away in the other direction. He recognized the men

2

as Jesse Reynosa and Willy Joe Sanchez. Jesse Reynosa was the driver of the Nissan. Cervantes's father also saw Rodriguez pinned between the Nissan and the house.

Officer Derrick Perez arrived at the scene. He peered over the doorframe of the Nissan and saw Rodriguez, who was injured and appeared to be trapped underneath the car. Officer Perez told Rodriguez to stay still and wait for an ambulance. After backup arrived, Officer Perez went to Rodriguez again and saw the barrel of a silver handgun sticking out from under Rodriguez's leg. Officer Perez drew his weapon and ordered Rodriguez to come out from under the Nissan. Rodriguez crawled out and Officer Perez placed him under arrest.

Detective Jaban Brownell arrived and collected the silver revolver, which he found between the Nissan and the house. He also found a Blackberry cell phone in the Nissan. He looked at the photos on the cell phone and saw photos of Reynosa, dressed in blue and flashing gang signs. Rodriguez was not in any of these photos. Detective Brownell determined that the Nissan was registered to Jesus Reynosa. Law enforcement quickly found Reynosa and arrested him. Law enforcement did not arrest Sanchez because no one advised them of his possible involvement in the shooting.

Rodriguez was taken by ambulance to Yakima Regional Medical Center. The emergency room medical staff removed Rodriguez's clothing, which an officer collected

3

as evidence. Rodriguez was wearing a blue and white Los Angeles Dodgers jersey. He was also wearing a blue rosary necklace, another blue necklace, and a blue bracelet. Rodriguez suffered at least two gashes for which he received stitches. Law enforcement eventually transported Rodriguez to the Yakima County jail.

During the booking process at the jail, Corporal Theresa Hartley questioned Rodriguez about potential gang affiliation to ensure he was safely housed away from rival gang members. She asked Rodriguez if he was a Norteño, and Rodriguez angrily shook his head. She then asked Rodriguez if he was a Sureño. According to Corporal Hartley, Rodriguez agreed by nodding his head. Corporal Hartley also completed an interview form. On this form, she indicated Rodriguez was a Sureño and could not get along with Norteños.

A forensic scientist at the Washington State Patrol Crime Laboratory tested the silver revolver from the scene. She swabbed the revolver and found deoxyribonucleic acid (DNA) from only one person on it. It was a substantial profile, which probably indicated the contributor handled the revolver more than briefly. Based on this, the Toppenish Police Department sent her DNA samples from both Reynosa and Rodriguez. She tested the samples and determined Rodriguez's DNA matched the sole DNA profile on the revolver. She excluded Reynosa as a contributor.

4

The State charged Rodriguez, as a principal or as an accomplice, with attempted first degree murder, two counts of first degree assault, and alleged that Rodriguez committed the offenses while armed with a firearm. In addition, the State alleged an aggravating factor—that Rodriguez committed the crimes to enhance his standing in a street gang.

Prior to trial, Rodriguez moved to exclude all evidence relating to gang membership. He also moved to exclude his statement to Corporal Hartley during the booking process and the interview form. The trial court held a hearing on Rodriguez's motion. The State gave an overview of the evidence it believed established a nexus between gang membership and the shooting. The court ruled some gang evidence would be admissible to give context for why one car of people would suddenly start shooting at another car of people. The court noted there was some evidence the Nissan's occupants were Sureños and the Escalade's occupants were Norteños. The court further ruled gang expert testimony would be admissible, but noted this testimony would be limited to explaining that the gangs were rivals. The court reserved ruling, until it heard Corporal Hartley's testimony, on whether Rodriguez's booking statements were admissible.

The court later held a CrR 3.5 hearing to determine if *Miranda*[1] applied to Corporal Hartley's booking interview. At the hearing, Corporal Hartley testified her concern, when she classifies new inmates, is inmate safety. She testified the jail does not house rival gang members together because they will automatically fight when they see one another. The court determined *Miranda* did not apply to the booking interview and admitted the booking statements.

Trial commenced. The State called Cervantes's father, who testified his son was a Norteño gang member. The State called Corporal Hartley, who testified that Rodriguez admitted he was a Sureño during booking. The trial court also admitted Corporal Hartley's interview form.

Before the State called its gang expert, Rodriguez renewed his objection to the admission of expert testimony regarding gang culture. He argued the State had little evidence the shooting was gang related. The trial court affirmed its earlier ruling that some expert testimony would help the jury understand why a car of people would be shooting at another car of people. As evidence the shooting was gang related, the court cited Rodriguez's blue clothing and jewelry, as well as the testimony that Cervantes was a Norteño.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The State called Detective Brownell as its gang expert. He testified the two main gangs in the Toppenish area are the Sureños and Norteños. He testified about their rivalry and the motivations for violence within gang culture. He testified gang violence is motivated in part due to the importance of "respect" in the gang culture, as violent acts will earn the respect of the person's fellow gang members. Report of Proceedings (RP) at 1021-22.

Detective Brownell further testified about indicators of gang membership, such as red clothing for Norteños and blue clothing for Sureños. He testified gang members dress this way to show allegiance to their gang. He also testified gang members wear sports apparel, based on both the team's color and the team's geographic location. He concluded that the totality of the evidence—the red Bulls jersey, the blue Dodgers jersey, and Rodriguez's blue jewelry—indicated the shooting was gang related.

Rodriguez testified in his defense. He testified he was not a Sureño gang member and denied he indicated to Corporal Hartley that he was. He testified Reynoso offered him a ride, he sat in the front passenger seat, and there was a person sitting behind him that he did not know. According to Rodriguez, who is a monolingual Spanish speaker, Reynoso and the person in the back began speaking in English excitedly. Reynoso then pulled up beside the Escalade and the backseat passenger shot into the Escalade several

7

times. The Escalade rammed into the Nissan, Rodriguez was knocked unconscious, and awoke soon after in the crumpled Nissan. Rodriguez denied knowing anything about the revolver prior to the shooting, and denied ever touching the revolver. He also denied knowing either of the victims.

On cross-examination, the State questioned Rodriguez about a jailhouse telephone call he made to a friend, Salvador Gutierrez. Rodriguez told Gutierrez to make sure people knew that if Cervantes and Arredondo testified, "'[T]hings [would] get stirred up.'" RP at 1177. Gutierrez responded, "'Or give a beating.'" RP at 1177. To which Rodriguez laughed, and said, "'Yeah, you understand.'" RP at 1177. Rodriguez admitted he made the statements. The State then directly confronted Rodriguez: "If you're not a gang member and not affiliated with a gang, how does any communication to another gang member not to testify cause them any fear whatsoever?" RP at 1179. Rodriguez, who had just confirmed that his statement implied Cervantes and Arredondo would receive a beating if they testified, confusingly answered, "Who was being caused fear?" RP at 1179.

The jury found Rodriguez guilty as charged. The jury also found that Rodriguez committed the offenses with a firearm, and that he committed the offenses to enhance his reputation in a street gang. At sentencing, and despite the jury's street gang finding, the

8

trial court elected not to impose the street gang enhancement. The trial court also determined that one of the assault convictions merged with the first degree attempted murder conviction.

The trial court sentenced Rodriguez to just over 40 years of incarceration. In addition, the trial court imposed $1,560 in LFOs, which included a $500 victim assessment, a $200 criminal filing fee, a $100 DNA collection fee, a $10 sheriff's service fee, a $250 jury demand fee, and a $500 fee for costs of incarceration. After imposing the LFOs, the trial court noted Rodriguez had some ability to pay, was healthy, was working at the time he was arrested, and was able to earn minimal wages while incarcerated. Rodriguez did not object to the trial court imposing the LFOs.

Rodriguez timely appealed. This court stayed this appeal pending the Washington State Supreme Court's decision in *State v. DeLeon*, 185 Wn.2d 478, 374 P.3d 95 (2016). *DeLeon* was decided in May 2016 and this court lifted the stay.

## ANALYSIS

A. ADMISSION OF GANG EXPERT TESTIMONY

Rodriguez argues the trial court improperly admitted Detective Brownell's expert opinion testimony about gang culture. He argues there was an insufficient nexus between the gang evidence and the charged crimes. He acknowledges some evidence suggested he

9

and Cervantes belonged to rival gangs, but argues this evidence failed to connect the crimes with their gang membership.

Evidence of street gang affiliation is admissible in a criminal trial if there is a nexus between the crime and gang membership. *State v. Scott*, 151 Wn. App. 520, 521, 213 P.3d 71 (2009). Because gang membership is constitutionally protected under the First Amendment to the United States Constitution's right of association, there must be a connection between the crime and the organization before the evidence becomes relevant. *Id.* at 526. "Generalized expert testimony on gangs, untethered to the specifics of the case on trial, is impermissible." *State v. Mancilla*, 197 Wn. App. 631, 644, 391 P.3d 507 (2017).

ER 404(b) guides the admission of gang evidence. *Scott*, 151 Wn. App. at 526. Gang evidence can be admitted under ER 404(b) when a trial court identifies a significant reason for admitting the evidence and determines that the relevance of the evidence outweighs any prejudicial impact. *Id.* at 527. A proper reason for admitting gang expert testimony is to establish a motive for a crime. *Id.*; *Mancilla*, 197 Wn. App. at 644. For example, it may help explain why a person is attacked by a relative stranger, may show the connection between codefendants, and may also explain the interactions of the various parties. *Scott*, 151 Wn. App. at 527-28.

10

A trial court properly admits such evidence when there is a connection between the gang's purposes or values and the offense. *Id.* at 527. However, when there is no connection between a defendant's gang affiliation and the charged offense, admission of the gang evidence is prejudicial error. *Id.* This court reviews the trial court's decision for an abuse of discretion. *Id.*

In *Scott*, a drug dealer gave his girlfriend Wendy drugs and a handgun. *Id.* at 522. The two broke up, and the drug dealer told Wendy he wanted his gun back and also wanted repayment for the drugs. *Id.* Wendy did not comply soon enough, so the defendant and several associates broke into her room in the middle of the night and stabbed Wendy's new boyfriend. *Id.*

The State moved in limine to admit evidence that the defendant was a gang member and that he committed the crimes because Wendy "disrespected" the gang. *Id.* at 523. The State argued Wendy's disrespect provided both the defendant's intent and his motive for taking part in the attack. *Id.* The State asserted its gang expert would testify to the importance of "respect" in the gang culture and why gang members would respond to "disrespect" with violence. *Id.* at 523-24. The trial court admitted the evidence on the condition it developed as the State anticipated. *Id.* at 524. However, at trial, the State never asked its expert about local members of the gang, the place of "respect" in gang

11

culture, gang response to "disrespect," or any connection between gang membership and the attack. *Id.* at 525. The jury convicted the defendant, and he appealed. *Id.* at 526.

The *Scott* court held that the gang evidence was admissible to show the motive behind the attack—to send a message to Wendy to repay her debts—and that without it, the attack by three strangers was otherwise unexplainable. *Id.* at 527. However, the court noted that while the State's offer of proof established a proper reason for admitting the gang evidence, the actual testimony at trial failed to prove a connection between gang affiliation and the crime. *Id.* at 528. The State did not show any of the defendant's associates were gang members. *Id.* The State also failed to provide expert evidence about the importance of "respect" in the gang culture or that violence was a recognized response to "disrespect." *Id.* The court noted that if the State had elicited its anticipated testimony, there would have been no error. *Id.* at 528-29. However, because it did not, the gang evidence was inadmissible under ER 404(b). *Id.* at 529.

In *Mancilla*, four defendants shot at a house from their car. *Mancilla*, 197 Wn. App. at 638-39. When the police arrived, they saw blue graffiti near the home's entrance. *Id.* at 638. The police arrested the four defendants, who had gang tattoos and were wearing blue clothing. *Id.* at 639. At trial, the State called a gang expert who testified about various aspects of gang culture. *Id.* at 640.

12

The *Mancilla* court affirmed the trial court's ruling that admitted the gang expert testimony. *Id.* at 646. The court reasoned the expert's gang testimony supported the State's theory of motive and explained why the defendants targeted the house. *Id.* at 644. The court further reasoned the blue graffiti left on the house and the defendants' blue clothing at the time of arrest provided ample reason to believe the shooting was gang related. *Id.* The court determined the expert's testimony "appropriately supplied the jury with the tools necessary to interpret this evidence and understand the State's theory of the case." *Id.*

Here, the trial court properly ruled that some evidence regarding gang culture would be admissible to prove motive—it gave context for why one car of people would suddenly start shooting at another car of people. As in *Mancilla*, Rodriguez's blue jersey and jewelry, the photos of Reynoso dressed in blue and flashing gang signs, and Cervantes's red jersey and Norteño gang membership all gave the State substantial justification for arguing the shooting was gang related. And, unlike in *Scott*, the gang expert's testimony here was tailored to the purpose for its admission and established a nexus between gang membership and the crimes charged.

Because the State introduced the gang evidence to establish a motive for the shooting, which the State supported through expert testimony, we conclude the State

established an adequate nexus between the crime and gang membership. The trial court

did not abuse its discretion when it admitted Detective Brownell's limited expert opinion

testimony regarding gang culture.

B.    FIFTH AMENDMENT CHALLENGE TO BOOKING STATEMENTS

Rodriguez argues his booking statements to Corporal Hartley—in which he

supposedly admitted he was a Sureño gang member—were obtained involuntarily, and

thus their admission at trial violated the Fifth Amendment.[2] He argues the error was not

harmless beyond a reasonable doubt because the State did not present sufficient

independent evidence of his gang affiliation.

The Fifth Amendment to the United States Constitution provides that a defendant

shall not "be compelled in any criminal case to be a witness against himself." In *DeLeon*,

our Supreme Court held that a defendant's booking statements to jail staff about his or her

gang affiliation are involuntary. *DeLeon*, 185 Wn.2d at 487. This is because jail staff ask

these questions so they can protect inmates from violence by housing them separately

---

[2] Rodriguez only sought to suppress these statements at trial on the basis that jail staff failed to give him *Miranda* warnings. He did not argue the statements were obtained involuntarily. Thus, the trial court never was presented with the issue.

However, the State does not contest whether Rodriguez preserved this issue for appeal. It instead concedes Rodriguez's challenge was "properly raised." Br. of Resp't at 1. But even if the State did not concede this point, we could review the issue if the admission of the booking statements constituted manifest constitutional error. RAP

14

from rival gang members. *Id.* at 486-87. To avoid being housed with rival gang members, inmates need to disclose their gang affiliations. *Id.* at 487. Therefore, because these statements are obtained involuntarily, the *DeLeon* court held that admitting them at trial violates a defendant's Fifth Amendment rights. *Id.*

Here, Rodriguez made statements to Corporal Hartley during the booking process to ensure his personal safety. The State concedes that under *DeLeon*, these statements were obtained involuntarily and their admission at trial violated Rodriguez's Fifth Amendment right against self-incrimination.

Even when constitutional error occurs, reversal is not automatic. *Mancilla*, 197 Wn. App. at 641. When faced with a constitutional error, appellate courts apply a harmless error test. *DeLeon*, 185 Wn.2d at 487. Under this test, this court will vacate a defendant's conviction unless the State can prove the erroneously admitted evidence was harmless beyond a reasonable doubt. *Id.* at 487-88. This court must find, beyond a reasonable doubt, that "'*any reasonable jury* would have reached the same result, despite the error.'" *Id.* at 487 (quoting *State v. Aumick*, 126 Wn.2d 422, 430, 894 P.2d 1325 (1995)).

---

2.5(a)(3); *State v. Young*, 158 Wn. App. 707, 718, 243 P.3d 172 (2010).

Application of the harmless error analysis to this case is guided by two factually similar cases: *DeLeon*, 185 Wn.2d 478 and *Mancilla*, 197 Wn. App. 631. In *DeLeon*, the State charged three defendants with first degree assault for shooting at rival gang members from their car. *DeLeon*, 185 Wn.2d at 481-82. At trial, the State introduced the defendants' booking statements, in which they indicated affiliation with the Norteño gang. *Id.* at 484. The State also introduced substantial gang affiliation evidence, apart from the improper booking statements. *See id.* at 488. The State introduced the clothes the defendants were wearing (some of which included the color red, which is associated with Norteño gangs), certain tattoos that included gang symbols, and a photo from a defendant's cell phone that derogatorily referenced the Sureño gang. *Id.* A witness testified she knew two of the defendants were gang members in high school. *Id.* A police officer testified he interviewed the three defendants after their arrest, and one of them mentioned two gangs, although the exact nature of the question and answer was unclear. *Id.*

The *DeLeon* court held this evidence was insufficient to meet the State's burden of proving harmless error. *Id.* at 488-89. The court reasoned that none of this untainted evidence of gang involvement was as strong, direct, or persuasive as the defendants' admissions during booking that they were gang members. *Id.* at 488. The court

16

determined these admissions outweighed the State's untainted evidence. *Id.* at 489. The court concluded it could not find "*beyond a reasonable doubt* that *any reasonable jury* would have reached the same result if given only the untainted evidence." *Id.* The court reversed the first degree assault convictions and remanded the case for a new trial untainted with inadmissible evidence. *Id.*

In *Mancilla*, the State charged four defendants with drive-by shooting and first degree assault for shooting at a house. *Mancilla*, 197 Wn. App. at 640. As in *DeLeon*, the State introduced the defendants' booking statements acknowledging gang membership. *Id.* However, unlike in *DeLeon*, the State presented evidence of the defendants' own statements, apart from their booking statements, concerning their gang affiliation. *Id.* at 641-42. Specifically, the State introduced a booking photo in which one of the defendants displayed a gang related hand sign, which the court held was a nonverbal admission of current gang membership. *Id.* The State also introduced recorded jail phone calls in which two other defendants implicated themselves as gang members. *Id.* at 642. The *Mancilla* court held that this independent evidence of admitted gang affiliation rendered the Fifth Amendment violation harmless beyond a reasonable doubt as to these three defendants. *Id.*

17

However, with respect to the fourth defendant, the State did not present any evidence of admitted gang affiliation other than his booking statements. *Id.* The only evidence of his gang affiliation was photographs of his gang tattoos. *Id.* The *Mancilla* court reasoned that under *DeLeon*, evidence of gang tattoos, even if accompanied by other indicia of gang membership, was insufficient to overcome the taint of an inadmissible booking statement. *Id.* Accordingly, the *Mancilla* court reversed the fourth defendant's conviction. *Id.* at 643.

We learn from *DeLeon* and *Mancilla* that the strongest evidence of gang affiliation comes from a defendant's own statements, and that such evidence will often be sufficient to render constitutional error harmless beyond a reasonable doubt.

Here, apart from the improperly admitted booking statements, the State's evidence at trial of Rodriguez's gang affiliation was that he was wearing a blue and white Los Angeles Dodgers jersey and three pieces of blue jewelry. Without more, this would be insufficient and a new trial would be required. However, the State's evidence also included Rodriguez's jailhouse telephone call instructing his friend to make sure that Cervantes and Arredondo knew if they testified they would get a beating. We conclude that Rodriguez's own statements, apart from his booking statements, so strongly

18

suggested his Sureño gang membership, that the improper admission of his booking statements was harmless beyond a reasonable doubt.[3]

## C.     UNPRESERVED ALLEGED LFO ERROR

Rodriguez argues the trial court erred when it ordered him to pay $760 in discretionary LFOs. He argues the trial court did not inquire into his ability to pay, nor did the State present any evidence regarding his ability to work, past income, current debts, or financial resources. He requests a new sentencing hearing for inquiry into his ability to pay.

RAP 2.5(a) provides that an "appellate court may refuse to review any claim of error which was not raised in the trial court." For this reason, a defendant who does not object to the imposition of discretionary LFOs at sentencing is not automatically entitled to review. *State v. Blazina*, 182 Wn.2d 827, 832, 344 P.3d 680 (2015). Rodriguez asks this court to accept discretionary review, which this court is entitled to do. *See id.* at 835.

---

[3] This court asked both parties for additional briefing on whether the DNA evidence was sufficient to render the constitutional error harmless beyond a reasonable doubt. Although we ultimately focused on Rodriguez's own implied admission he was a gang member, the DNA evidence probably renders the constitutional error harmless. Here, the forensic scientist testified she closely inspected the gun and did not see any blood on the gun. She also testified that the substantial amount of Rodriguez's DNA on the gun was inconsistent with Rodriguez's theory that his DNA was transferred when his leg rested on the gun. But even more important, Rodriguez's theory does not account for the complete absence of any other person's DNA on the gun.

19

An approach favored by this author is to consider the administrative burden and expense

of bringing a defendant to court for a new hearing, versus the likelihood that the

discretionary LFO result will change. *State v. Arredondo*, 190 Wn. App. 512, 538, 360

P.3d 920 (2015), *aff'd*, __Wn.2d__, 394 P.3d 348 (2017). "An important consideration of

this analysis is the dollar amount of discretionary LFOs imposed by the sentencing court."

*Id.* In this case, the majority of these factors weigh against reviewing Rodriguez's

unpreserved LFO challenge.

The dollar amount of the discretionary LFOs the trial court imposed supports

granting review. The trial court imposed both mandatory and discretionary LFOs. The

mandatory LFOs included the $500 victim assessment, the $200 criminal filing fee, and

the $100 DNA collection fee. *See* RCW 7.68.035(1)(a); RCW 36.18.020(2)(h);

RCW 43.43.7541. These mandatory LFOs are required irrespective of Rodriguez's

ability to pay. *State v. Lundy*, 176 Wn. App. 96, 103, 308 P.3d 755 (2013). The

discretionary LFOs in this case were the $10 sheriff's service fee, the $250 jury demand

fee,[4] and the $500 fee for costs of incarceration, totaling $760. *See* RCW 10.01.160(2);

RCW 36.18.016(3)(b); RCW 9.94A.760(2).

---

[4] This court has recently observed that the mandatory or discretionary nature of the
$250 jury demand fee is unclear. *State v. Clark*, 195 Wn. App. 868, 872, 381 P.3d 198

However, the second factor—the additional administrative expense of bringing Rodriguez to court so the trial court could inquire into his current or likely future ability to pay—weighs in favor of declining review. Here, remand is not required to address any other error.

The final factor also weighs in favor of declining review—a new sentencing hearing would not likely change the LFO result. Rodriguez testified at trial he had been employed for five years at Washington Beef and was working for Amtech (a fiberglass company) at the time of his arrest. He retained private trial counsel. He was 24 years old at the time of sentencing, and the trial court found he was healthy and capable of earning a minimal wage while incarcerated.

Considering the small likelihood that a new sentencing hearing would change the LFO result and the administrative expense of holding a new sentencing hearing, we decline to exercise our discretion under RAP 2.5(a) to review Rodriguez's unpreserved LFO challenge.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW (SAG)

A defendant is permitted to file a pro se SAG in a criminal case on direct appeal. RAP 10.10(a). This statement is not required to cite authorities or to the record itself, but

---

(2016), *remanded to trial court*, 187 Wn.2d 1009, 388 P.3d 487 (2017). It is assumed

21

must have sufficient specificity to inform the court of the "nature and occurrence" of specified errors. RAP 10.10(c). The SAG must not rely on matters outside the record. *State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995).

A.   DEFENSE WITNESS ISSUES

Rodriguez argues he was deprived of a fair trial because his attorney never filed a list of defense witnesses before trial. The defense is required to "disclose to the prosecuting attorney . . . the names and addresses of persons whom the defendant intends to call as witnesses." CrR 4.7(b)(1). The reason for this rule is to ensure fairness to the *State*, by preventing last-minute surprise and affording opportunity for effective cross-examination. *State v. Linden*, 89 Wn. App. 184, 193, 947 P.2d 1284 (1997) (quoting *State v. Dunivin*, 65 Wn. App. 728, 733, 829 P.2d 799 (1992)). Rodriguez fails to explain how his attorney's alleged violation of this rule deprived *him* of a fair trial.[5]

Rodriguez also argues he was prevented from calling his girlfriend, Cristal Valencia, as a witness. He claims the State's victim-witness advocate, Lisette Allan, called Valencia and instructed her not to come to trial. However, there is no evidence of this in the record. Thus, this court cannot consider this issue on direct review. The

---

here that this fee is discretionary.

[5] Although the clerk's papers do not contain a defense witness list, defense counsel advised at trial that he filed one.

22

appropriate means of litigating this issue is through a personal restraint petition. *See McFarland*, 127 Wn.2d at 335.

Rodriguez also argues he did not receive a fair trial because Cervantes did not testify as a witness. However, the State did not introduce any hearsay statements by Cervantes, so Rodriguez was not deprived of his right to confrontation. In any event, Rodriguez attempted to prevent Cervantes from testifying. He cannot now argue that this deprived him of a fair trial.

B.    ALLEGED JUROR BIAS

Rodriguez contends the trial court erred by failing to excuse a biased juror. He argues a juror was biased because he or she worked for the city of Toppenish, knew all of the State's witnesses, and also knew Arredondo.

Criminal defendants have a constitutional right to trial by an impartial jury. *See* U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. A party claiming actual bias must establish it by proof. *State v. Noltie*, 116 Wn.2d 831, 838, 809 P.2d 190 (1991). To prevail, a party must show more than a possibility of prejudice. *Id.* at 840 (quoting 14 LEWIS ORLAND & KARL TEGLAND, WASH. PRACTICE: TRIAL PRACTICE § 203, at 331 (4th ed. 1986).

23

At the beginning of voir dire, the trial court recited the names on the State's witness list to the venire. Venire juror 12 indicated she knew most of the officers who worked for the Toppenish police department. Upon questioning, she stated that she worked for the city of Toppenish, that she was only acquainted with the officers, and that she did not have any contact with them outside of work. She stated knowing the officers would not affect her ability to be fair and impartial.

The State's first witness was Arredondo. After he testified, venire juror 12 informed the bailiff, who informed the court, that she recognized Arredondo as a former seasonal employee for the city of Toppenish. Upon questioning by the court, she stated that the city had employed Arredondo a long time ago, and that recognizing him would not affect her ability to be fair and impartial.

Although venire juror 12 worked for the city of Toppenish and recognized several of the State's witnesses through her job, she stated she could still be fair. Rodriguez fails to show more than a *possibility* of prejudice. Based on the record, there is insufficient evidentiary support for his claim that venire juror 12 was actually biased.

C.    TIME FOR TRIAL RULE

Rodriguez also contends the trial court "violated [his] rights by not going to trial because of continuances." SAG at 2. Based on this statement, he appears to argue the

24

trial court failed to bring him to trial within the time required under CrR 3.3. However,

he has generally failed to designate any clerk's papers or transcripts from before March

2014. By this point, the case was nearly two years old, due to Rodriguez's and the State's

requests for continuances. Without any record of the proceedings from the first two years

of the case, this court is unable to fully consider whether he was brought to trial within

the time required by CrR 3.3.

However, this court *is* able to consider whether the trial court abused its discretion

in granting continuances in the time period for which Rodriguez designated transcripts—

between March 2014 and September 2014.

Continuances under CrR 3.3(f) are excluded in computing the time for trial.

CrR 3.3(e)(3). The court may grant a continuance under this rule when

> such continuance is required in the administration of justice and the
> defendant will not be prejudiced in the presentation of his or her defense.
> The motion must be made before the time for trial has expired. The court
> must state on the record or in writing the reasons for the continuance.

CrR 3.3(f)(2). A trial court has discretion to grant a continuance under CrR 3.3 and its

decision will not be disturbed absent a manifest abuse of discretion. *State v. Torres*, 111

Wn. App. 323, 330, 44 P.3d 903 (2002).

"Unavailability of a material prosecution witness is grounds to delay the trial for a

reasonable time." *Id.* at 329. For a court to grant a continuance on this basis, there must

25

be a valid reason for the unavailability, the witness must become available within a reasonable time, and there must not be substantial prejudice to the defendant. *State v. Nguyen*, 68 Wn. App. 906, 914, 847 P.2d 936 (1993). The moving party must also have exercised due diligence in subpoenaing the necessary witnesses. *State v. Adamski*, 111 Wn.2d 574, 579, 761 P.2d 621 (1988).

The trial court has discretion to grant a continuance under CrR 3.3(f) "to allow defense counsel more time to prepare for trial, even over defendant's objection, to ensure effective representation and a fair trial." *State v. Williams*, 104 Wn. App. 516, 523, 17 P.3d 648 (2001). Scheduled vacations of counsel and officers also justify continuances under CrR 3.3(f). *Torres*, 111 Wn. App. at 331. As does accommodating an officer's mandatory training. *State v. Jones*, 117 Wn. App. 721, 729, 72 P.3d 1110 (2003). The court may also consider scheduling conflicts in determining whether a continuance is warranted. *State v. MacNeven*, 173 Wn. App. 265, 270, 293 P.3d 1241 (2013).

The transcripts Rodriguez designated for review indicate the trial court granted four CrR 3.3(f) continuances between April 2014 and when trial began in September 2014.[6] The trial court's first two continuances—on April 18 and June 20—were joint

---

[6] The trial court reset the trial date within the existing time for trial period twice—on March 24 and August 8—but these were not continuances within the meaning of CrR 3.3(f).

26

requests from the State and defense counsel and were over Rodriguez's objections. The court granted the continuances on the grounds that (1) Detective Brownell and three other officers on the State's witness list had training, (2) Detective Brownell was in trial on another case, (3) several other officers had prescheduled vacation, and (4) defense counsel had a two-day continuing legal education class, and also had scheduled vacation, commitments as a judge pro tem, and needed time to finish the brief regarding Rodriguez's booking statements to jail staff.

On July 16, the court granted a continuance, over the defense's objection, on the grounds that the State had lost contact with both Arredondo and Cervantes, whom the State had previously subpoenaed. The court had previously signed material witness warrants, officers had been looking for them throughout the night, and United States Marshals had joined the search. For these reasons, the State was confident Arredondo and Cervantes would become available soon.

On August 22, the court granted a final continuance, over the defense's objection, on the grounds that the State had just obtained and translated two new recorded jailhouse telephone calls. Rodriguez had made these calls from other inmates' telephone accounts and they revealed his attempts to tamper with the State's witnesses. The court granted the continuance so the State could file witness tampering charges and seek to admit

27

No. 32867-8-III
*State v. Rodriguez*

Cervantes's prior statements to police under the forfeiture by wrongdoing hearsay exception.

For each continuance here, the trial court properly found the continuances were required in the administration of justice. It also properly found Rodriguez would not be prejudiced—defense counsel repeatedly stated the delays did not prejudice Rodriguez's case in chief, given that his only witnesses were his friends and family members. The record indicates all the motions for continuances were made before the time for trial had expired. The trial court also made a record as to the reasons for the continuances. In light of the trial court's compliance with CrR 3.3(f), the court did not abuse its discretion in granting these four continuances.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Fearing, C.J.

Korsmo, J.

28