# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  48796-9-II |
| Respondent, | |
| v. | |
| QIUORDAI LEWIS TAYLOR, | UNPUBLISHED OPINION |
| Appellant. | |
| STATE OF WASHINGTON, | (Consolidated with No. 48799-3-II) |
| Respondent, | |
| v. | |
| DUPREA ROMON WILSON, | |
| Appellant. | |

JOHANSON, P.J.  —  Qiuordai L. Taylor, Duprea R. Wilson, and Taijon Voorhees were accomplices in a home invasion robbery, in which a victim shot and killed Voorhees.  Taylor and Wilson appeal their 11 convictions and sentences from their joint trial.

We hold that for both Wilson and Taylor, the evidence is insufficient to support the firearm sentencing enhancements on their first degree manslaughter convictions but the evidence is sufficient to support their first degree assault convictions, manslaughter convictions, and remaining challenged firearm sentencing enhancements.  We further hold that the trial court

properly declined to give Wilson's proposed jury instruction, that each defendant's second degree assault with a knife conviction did not merge with a robbery conviction, and that any error related to the same criminal conduct finding was harmless.

Accordingly, we affirm Wilson's and Taylor's convictions, but we dismiss the firearm sentencing enhancements on the manslaughter convictions with prejudice. We also sua sponte remand for correction of the judgment and sentences to reflect that one of Wilson's and Taylor's convictions was subject to a deadly weapon enhancement, not a firearm sentencing enhancement.

FACTS

I. BACKGROUND

In November 2014, three men, later determined to be Wilson, Taylor, and Voorhees,[1] set out to rob a marijuana dispensary but mistakenly went to the home of Harry and Janice Lodholm. The three forced themselves into the Lodholms' home, where they held the Lodholms at gunpoint and demanded marijuana, gold, and money. During the home invasion, one intruder struck Harry[2] with the butt of a firearm and threatened to shoot him, and Janice's hand was cut by a knife that another intruder wielded. The intruders bound the Lodholms, leaving them on their living room floor while ransacking their home.

When the intruders left the house, Harry escaped his bonds, freed Janice, and locked the front door. A shot was fired from outside into the front door, and Harry retreated to the bedroom

---

[1] The victims, the Lodholms, testified at trial that the intruders concealed their faces using masks and bandanas, so that it was not clear which intruder committed which acts.

[2] Where necessary for clarity, we refer to the Lodholms by their first names. No disrespect is intended.

with Janice. Harry then shot Voorhees when he attempted to enter the bedroom, and the three intruders fled. Rather than taking Voorhees to a hospital, where Wilson and Taylor feared questioning, Wilson and Taylor drove Voorhees to an apartment complex in Federal Way. By the time Wilson and Taylor left Voorhees in the complex's parking lot, Voorhees had died from the gunshot wounds. Wilson and Taylor were later arrested.

## II. CHARGES

The State charged Wilson and Taylor with 11 counts: first degree manslaughter for Voorhees's death (count I), two counts of first degree assault for the shot fired into the front door (counts II-III), two counts of first degree robbery (counts IV-V), two counts of first degree kidnapping (counts VI-VII), first degree burglary (count VIII), and three counts of second degree assault for assaulting Harry and Janice with a gun and Janice with a knife (counts IX-XI). For the first degree assaults (counts II-III), first degree robberies (counts IV-V), first degree kidnappings (counts VI-VII), and second degree assaults (counts IX-XI), the State charged separate counts for the crimes against Harry and against Janice. The third second degree assault count (count XI) was the only count not subject to a firearm sentencing enhancement and was subject to a deadly weapon enhancement for using a deadly weapon, "to-wit: a knife," to assault Janice. Clerk's Papers (CP) at 419, 920.

## III. TRIAL

In February 2016, Wilson and Taylor's jury trial began. Neither Wilson nor Taylor testified or put on testimony in their defense.

3

A. LODHOLMS' TESTIMONY

In November 2014, Harry was at home, in his living room, when the three intruders knocked on his front door. As he unlocked the door, the intruders forced themselves in, and an intruder pushed Harry onto the floor and struck him in the back of the head with "the butt of [a] pistol" twice. 3 Report of Proceedings (RP) at 205. Harry did not see the gun but felt it strike him.

One of the intruders forced Harry to the ground, "smack[ing]" Harry's head and "put[ting] his . . . fingers into" the wounds on Harry's head, and screamed repeatedly, "'I want your weed [marijuana]. I want your gold. I want your money.'" 3 RP at 207. When Harry protested that he had none of those things, the intruder threatened to "'cap'" Harry and "stick a bullet in [Harry's] head." 3 RP at 208. Harry felt the "front sights and the roundness of the barrel" of a gun against his head and identified the gun by touch as a "revolver-type of a pistol." 3 RP at 210. Harry noticed that he was bleeding onto the carpet from the blow to his head.

The intruder near Harry ordered another intruder to "'[g]o get the wife.'" 3 RP at 209. One of the intruders went to the bathroom, where Janice was taking a bath, and kicked in the door. This intruder "c[ame] around the door," wielding a long knife that Janice "saw . . . coming down at" her, and she instinctively raised her hand "to move his hand and the knife out of [her] face." 4 RP at 280-81. In doing so, the knife cut Janice's hand. The knife-wielding intruder punched Janice and dragged her to the living room. There, Janice saw Harry crouched on the floor and two more intruders, one of whom pointed a "gun with a long barrel" at Janice and demanded "weed," "gold," and "money." 4 RP at 283, 285. The intruder with the gun ordered Janice to the ground and held the gun to her head.

4

The intruders tied Harry and Janice up on an area rug in their living room after forcing Janice to the ground, and they ransacked the Lodholms' home. Referring to Janice, an intruder said, "'Just shoot her in the head, shoot her in the head now,'" and another replied, "'No, not yet.'" 3 RP at 214-15.

When the intruders left the home, Harry untied himself and Janice, closed and locked the front door, and sent Janice to the bedroom to call 911. Harry heard a gunshot fired near the front door where he was standing, and he retreated to the bedroom and retrieved his pistol.

While Harry and Janice hid in the bedroom, an intruder "bang[ed] through" the bedroom door. 3 RP at 221. Harry could see this intruder's upper body and head as well as another intruder standing a few feet behind the intruder who entered the bedroom. Harry shot the intruder who entered the bedroom and yelled that anyone who entered the bedroom would die. Harry heard a third intruder say, "'We got to get out of here.'" 3 RP at 221-22. The intruders left, taking some of the Lodholms' belongings, and shortly afterward the police arrived.

### B. POLICE AND MEDICAL EXAMINER TESTIMONY

Police responded to the scene and found that a backpack containing the intruders' cell phones had been left in the Lodholms' den. Police also observed that a bullet had been fired into the Lodholms' front door, within a foot under the door handle. The bullet had lodged in but did not penetrate the front door and appeared to have been shot at a downward angle. Police suspected that the bullet had been fired by a revolver-type pistol based upon the absence of a shell casing at the scene. Analysis confirmed that the bullet had not been fired from Harry's gun. The firearm used by the intruders was not located.

5

Police officers also described the layout of the Lodholms' living room. An officer testified that the Lodholms' living room was "straight ahead" when one entered through the front door. 3 RP at 188. "[T]oward the middle of the room" was the rug, stained with Harry's and Janice's blood, where the Lodholms had been tied. 3 RP at 188. The blood was "right inside" the front door, about "six feet" away. 3 RP at 199.

Early the next day, police found Voorhees's body in the parking lot of an apartment complex. About an hour after the home invasion, a caller who identified himself as "Frank Smith" reported hearing shots fired and seeing a body fall at the apartment complex. 5 RP at 449. Investigators were unable to contact "Smith" or find any evidence to confirm that Voorhees had been shot at the apartment complex.

An autopsy of Voorhees's body revealed that Harry had shot Voorhees in his abdomen and thigh. The medical examiner who performed the autopsy opined that Voorhees had died from the thigh wound but that with medical attention, Voorhees could have survived the injury. Had someone applied sufficient pressure to the wound, Voorhees would have survived for "hours"; without any attempt to stop the bleeding, Voorhees would have survived for "minutes." 5 RP at 555, 563. Voorhees had bled to death approximately an hour after the Lodholms had called 911. There was at least one emergency room located near the Lodholms' home.

## C. VOORHEES'S GIRLFRIEND'S TESTIMONY

Voorhees's girlfriend testified that Wilson contacted her on the night of the home invasion and arranged a meeting for the next morning. At the meeting, Wilson told Voorhees's girlfriend that Voorhees had been shot when he returned to the Lodholms' home to retrieve the backpack

that the intruders had left behind. Wilson had said that Voorhees shot the front door in order to "break down the door." 5 RP at 490.

According to Voorhees's girlfriend, Wilson told her that as the intruders drove, Voorhees cried out in pain from his wounds and begged Wilson and Taylor to keep speaking to him. Fearful of questioning, Wilson and Taylor had not taken Voorhees to a hospital but had driven to the apartment complex to drop Voorhees's body off. Voorhees was dead when Wilson and Taylor left him. Wilson called 911 and fabricated a story about Voorhees being shot at the apartment complex "so the response time would be faster." 5 RP at 487.

### IV. DEFENSE MOTIONS AND JURY INSTRUCTIONS

At the close of the State's case, Wilson brought three motions to dismiss charges against him; Taylor joined in each motion. First, Wilson moved to dismiss the manslaughter charge (count I) on the basis that the State had to prove a duty to render aid and that no such duty arose under the facts of the case. Taylor alternatively argued that he and Wilson had in fact rendered aid when they called 911. The trial court denied this motion. In doing so, the trial court reasoned that a duty to render aid arose in the car when the intruders left the Lodholms' home.

Second, Wilson argued that the two first degree assault counts (counts II-III) should be dismissed because there was no evidence that the shot into the door had been fired with an intent to inflict great bodily harm. The trial court denied Wilson's motion, reasoning that the intruders knew that they had left the Lodholms tied up in the living room, near the front door.

Third, Wilson argued that the firearm sentencing enhancements should be dismissed because the State had not shown that a firearm, rather than a "toy, a gun-like object," had been

7

used. 8 RP at 1035. The trial court denied this motion on the basis that the same working firearm used to shoot the front door had been used for the other crimes.

Related to the jury instructions about manslaughter (count I) the prosecutor requested the trial court not to instruct the jury on the existence of a duty to render aid and instead to instruct the jury on only proximate causation. Wilson and Taylor agreed that the prosecutor's proposed causation instructions were appropriate but argued that an additional instruction had to be included to address the duty issue. Wilson proposed an instruction that one "generally has no duty to render or summon medical aid to an injured person" unless his "actions create or increase the risk of injury to the person injured." CP at 1075. The trial court declined to instruct the jury on duty because the State's proposed proximate cause instructions "allow[ed] both sides to argue the correct statement of the law." 9 RP at 1095.

The trial court gave the pattern jury instructions on manslaughter and proximate cause. *See* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 28.01, at 406 (4th ed. 2016) (WPIC); WPIC 28.02, at 407; WPIC 25.02, at 375. The jury instructions also directed the jury to consider by special verdict whether Wilson and Taylor were guilty of the firearm sentencing enhancements imposed on counts I through X. The jury instructions specifically stated that the second degree assault with a knife (count XI) required proof that "the defendant was armed with a deadly weapon" rather than a firearm. CP at 735, 1211.

## V. DEFENSE CLOSING ARGUMENT

In closing, related to the manslaughter charges, Wilson and Taylor argued that they had no legal obligation to help Voorhees seek treatment and that Voorhees, not Wilson or Taylor, had caused his own death when he returned to the Lodholms' home. Wilson further argued that even

8

with medical attention, Voorhees would have died within minutes and that there was no evidence that Wilson had been the one who decided to not go to the hospital.

## VI. VERDICTS AND SENTENCING

The jury found Wilson and Taylor guilty as charged, including the related sentencing enhancements: firearm sentencing enhancements on all counts except the second degree assault with a knife (count XI), which was subject to a deadly weapon enhancement for both defendants.

The State conceded that for both defendants, the second degree assaults with a firearm (counts IX and X) merged into the first degree robberies (counts IV and V). At the sentencing hearing, Wilson and Taylor argued that for each of them, the second degree assault of Janice with a knife (count XI) also merged into the first degree robbery of Janice (count V). Wilson and Taylor claimed that the second degree assault with a knife (count XI) was in furtherance of the robbery in count V, just like the second degree assault with the firearm (count X) was in furtherance of the robbery in count V. The trial court disagreed and ruled that the convictions for second degree assault with a knife (count XI) did not merge "primarily because of the weapon [the knife] and the facts as I know them, breaking through the door and displaying a knife and [Janice] getting hurt." RP (March 25, 2016) at 20.

Wilson and Taylor also argued that all their crimes except the manslaughter convictions (count I) and the first degree assault convictions (counts II-III) arose from the "same criminal conduct" for each victim. RP (March 25, 2016) at 20. According to Wilson and Taylor, each crime reflected the same criminal intent to "rob [the Lodholms'] house" by breaking in, assaulting the Lodholms, taking their property, and tying them up. RP (March 25, 2016) at 21. Wilson and Taylor agreed that regardless of whether their convictions arose from the same criminal conduct,

9

the "weapons enhancements st[ood]." RP (March 25, 2016) at 21. And they stated that the same criminal conduct issue mattered solely to calculate the offender score, although the offender score would "be a nine plus" "because of multiplie[r]s" regardless of the same criminal conduct determination. RP (March 25, 2016) at 22.

The State responded that the burglary, robbery, and kidnapping convictions did not involve the same criminal intent. The State agreed that the same criminal conduct issue was "a little bit academic" because Wilson's and Taylor's offender scores would exceed nine regardless of the same criminal conduct analysis. RP (March 25, 2016) at 29. The trial court agreed with the State and found that none of the crimes constituted the same criminal conduct, although the trial court stated that the issue was "academic." RP (March 25, 2016) at 29. In doing so, the trial court noted the burglary "anti-merger statute" and that the "[r]obbery and the [k]idnap" "have got different intents." RP (March 25, 2016) at 23.

The trial court entered exceptional sentences downward for Wilson and Taylor—zero months for each count except for the manslaughter counts (count I), for which Wilson and Taylor were sentenced to 102 months. The trial court imposed community custody and firearm sentencing enhancements[3] on each count, even the second degree assault with a firearm counts (IX-X) that merged with the robbery counts (counts IV-V). Because the firearm sentencing enhancements ran consecutively, Wilson and Taylor received 666-month sentences.

---

[3] Although the special verdict for second degree assault with a knife (count XI) related to whether Wilson was "armed with a deadly weapon," CP at 1239, and the charging document for both defendants stated that the knife assault (count XI) was subject to a deadly weapon enhancement, the judgment and sentences imposed a firearm sentencing enhancement on the knife assault (count XI).

Wilson and Taylor appeal their convictions and sentences. Under RAP 3.3(a), we consolidated their appeals.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

#### A. STANDARD OF REVIEW

Due process requires that the State prove every element of a crime beyond a reasonable doubt. U.S CONST. amend. XIV; WASH. CONST. art. I, § 3; *In re Matter of Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d. 368 (1970). Where a defendant claims insufficient evidence to support his conviction, we determine whether "'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). We take as true the State's evidence and all reasonable inferences therefrom and defer to the fact finder's determinations of witness credibility, persuasiveness of the evidence, and conflicting testimony. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992); *State v. Andy*, 182 Wn.2d 294, 303, 340 P.3d 840 (2014). If we agree that the evidence was insufficient to support a conviction, we reverse and remand for dismissal of the conviction with prejudice. *State v. Rodgers*, 146 Wn.2d 55, 60, 43 P.3d 1 (2002).

#### B. FIRST DEGREE ASSAULTS (COUNTS II AND III)

Wilson and Taylor argue that there is insufficient evidence of an intent to inflict great bodily harm to find them guilty of first degree assault (counts II-III). They also briefly argue that

the trial court should have granted the motion to dismiss these charges for insufficient evidence. We disagree.

1.      LEGAL PRINCIPLES

As charged in this case, first degree assault occurs when, "with intent to inflict great bodily harm," a person "[a]ssaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death." RCW 9A.36.011(1)(a). A person acts with "intent" if he "acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). Evidence of criminal intent may be circumstantial, so long as conduct "'plainly indicates such intent as a matter of logical probability.'" *State v. Brooks*, 107 Wn. App. 925, 929, 29 P.3d 45 (2001) (quoting *State v. Bergeron*, 105 Wn.2d 1, 20, 711 P.2d 1000 (1985)).

2.      EVIDENCE SUFFICIENT TO FIND INTENT TO COMMIT GREAT BODILY HARM

Wilson and Taylor were each convicted of first degree assault of Harry and of Janice (counts II-III) under RCW 9A.36.011(1)(a), including firearm sentencing enhancements for both counts. The State argued that the first degree assaults were based upon the intruders' shooting into the front door before reentering the Lodholms' home. Wilson's and Taylor's arguments ask us to determine whether, in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that the intruder who shot the front door intended to inflict great bodily harm to Harry and Janice. *See Green*, 94 Wn.2d at 221; RCW 9A.36.011(1)(a).

The facts viewed in the light most favorable to the State are that the intruders forced themselves into the Lodholms' home, threatened to shoot Harry and Janice, and tied Harry and Janice up on an area rug in their living room while they ransacked the home. Police later observed

12

that the blood-stained rug where the Lodholms had been tied up was "toward the middle of" the living room, "right inside" and about "six feet" from the front door. 3 RP at 188, 199.

Harry heard the three intruders walk out the front door, at which point Harry "rapidly" untied himself, closed and relocked the door, untied Janice and sent her to the bedroom, and then returned to check that he had securely locked the front door. 3 RP at 215. At that moment, the intruders returned and "bashed into the door" and window. 3 RP at 216. Harry, who was standing behind the front door, heard a shot fired into the door and the intruders break the window, and he retreated to his bedroom. Police officers confirmed that a bullet had been fired into the Lodholms' door, within a foot below the door handle, at a downward angle, and had lodged in the front door.

These facts and the reasonable inferences therefrom establish an intent to cause great bodily harm because it is a reasonable inference that the intruder who fired the shot into the front door believed that the Lodholms remained tied up on the floor "right inside" the front door. 3 RP at 199. The intruders' earlier threats to kill Harry and Janice and holding them at gunpoint also provide circumstantial evidence of intent to cause great bodily harm to both. *See Brooks*, 107 Wn. App. at 929.

*State v. Mancilla* is illustrative. 197 Wn. App. 631, 391 P.3d 507, *review denied*, 188 Wn.2d 1021 (2017). In *Mancilla*, there was sufficient evidence of intent to cause great bodily harm to support first degree assault convictions when in the early morning, the defendants shot into a small, single-wide trailer home that had cars parked outside. 197 Wn. App. at 640, 649. Division Three of this court stated that there had to be proof of intent to harm an actual person but not "proof as to a specific victim." 197 Wn. App. at 649. Applying this rule, the evidence was sufficient because "the defendants could be expected to know the house they were shooting at was

13

occupied" and that "injuries were likely." 197 Wn. App. at 649. Similarly here, the intruders could be expected to know that they were shooting into the area where they had left the Lodholms tied up and that injuries were likely. In conjunction with specific, earlier threats to kill the Lodholms and assaulting the Lodholms with a firearm and Janice with a knife, the intruders' actions are sufficient evidence to support a conclusion that the intruder who fired into the front door had the intent to cause great bodily harm.

Harry testified that he locked the front door after escaping his restraints, and Voorhees's girlfriend testified that according to Wilson's account of the events, the shot at the door was fired to "break [it] down." 5 RP at 490. Relying on the testimony that the front door was locked, Wilson and Taylor argue that the evidence of intent to cause great bodily harm is insufficient because the gunshot was fired to open the locked front door. But this argument overlooks that the facts and reasonable inferences therefrom in favor of the State—including the threats to kill Harry and Janice, holding them both at gunpoint, and leaving them tied up on the floor near the door—support that the shot was fired with an intent to cause great bodily harm. Because we defer to the jury where the evidence is conflicting or involves determinations of persuasiveness and witness credibility, Wilson's and Taylor's arguments that there is insufficient evidence of intent to cause great bodily harm fail. *See Andy*, 182 Wn.2d at 303.

We hold that there was sufficient evidence to support Wilson's and Taylor's first degree assault convictions (counts II-III). Thus, the trial court also properly denied the motion to dismiss

the first degree assault convictions (counts II-III) for lack of evidence of intent to commit great

bodily harm.[4]

## C.  FIRST DEGREE MANSLAUGHTER (COUNT I)

Wilson and Taylor argue first, that there was insufficient evidence to convict them of first

degree manslaughter of Voorhees (count I) and second, that the trial court should have granted the

motion to dismiss the manslaughter charges for insufficient evidence.  They argue that a duty to

render aid did not arise, that there was no evidence that they withheld Voorhees from medical care,

and that they did, in fact, summon aid.  We reject Wilson's and Taylor's arguments.

### 1.  DUTY TO RENDER AID

Wilson and Taylor begin with the premise that one can be criminally liable for failure to

act only if there is an affirmative duty to act.  Wilson and Taylor argue that the evidence here does

not establish that a duty to render aid arose under the facts and accordingly that they cannot be

criminally liable for any failure to act.  We disagree and hold that there was sufficient evidence to

establish a duty to render aid.

It is true that a person is generally not criminally liable for the failure to act unless there is

a duty to affirmatively act.  *E.g.*, 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 6.2(a), at

436 (2d ed. 2003) ("For criminal liability to be based upon a failure to act it must first be found

that there is a duty to act. . . . Generally one has no legal duty to aid another person in peril."); *see*

*also State v. Utter*, 4 Wn. App. 137, 140, 479 P.2d 946 (1971) (defining an "'act'" as a "willed

---

[4] We apply the same standard to the denial of the motion to dismiss for insufficient evidence as to Wilson's and Taylor's claim of insufficient evidence on appeal. *See State v. Jackson*, 82 Wn. App. 594, 607-08, 918 P.2d 945 (1996); *State v. McKeown*, 23 Wn. App. 582, 588, 596 P.2d 1100 (1979).

movement or the omission of a possible and *legally-required* performance") (emphasis added). It also is generally true that a duty to act arises where the defendant created the peril. 1 LAFAVE, SUBSTANTIVE CRIMINAL LAW § 6.2(a)(5), at 441; *see also United States v. Hatatley*, 130 F.3d 1399, 1406 (1997) ("When a person puts another in a position of danger, he creates for himself a duty to safeguard or rescue the person from that danger. . . . Thus, when a person places another in danger, fails to safeguard or rescue him and he dies, such omission is sufficient to support criminal liability.").

As charged in this case, "[a] person is guilty of manslaughter in the first degree when . . . [he] recklessly causes the death of another person." RCW 9A.32.060(1)(a). Washington cases have recognized a duty to affirmatively act under certain circumstances, and a violation of the duty satisfies the recklessness element for a manslaughter conviction. *See State v. Morgan*, 86 Wn. App. 74, 80, 936 P.2d 20 (1997). These circumstances include where a defendant failed to summon aid for someone whom the defendant "helped place in danger." *Morgan*, 86 Wn. App. at 81.

At trial, the State introduced evidence that the three intruders planned to rob a marijuana dispensary but robbed the Lodholms' home instead. The intruders reentered the Lodholms' home in order to retrieve a backpack that contained their cell phones, ostensibly to avoid leaving behind identifying evidence. After they did so, Harry shot Voorhees. We hold that these facts were sufficient to establish that under the circumstances and in light of *Morgan*, a duty to render aid to Voorhees arose.

In *Morgan*, the defendant "helped place" his wife in danger because there was evidence that the defendant injected his wife with cocaine and then failed to summon medical aid. 86 Wn.

16

App. at 76-77, 81. Similarly, here, viewed in the light most favorable to the State, it is a reasonable inference that Wilson's and Taylor's participation in the robbery helped to place Voorhees in danger. Voorhees returned to the crime scene with Wilson and Taylor to retrieve incriminating evidence, and when he did so he was shot. Thus, as in *Morgan*, we hold that there is sufficient evidence to establish that Wilson and Taylor owed a duty to render aid to Voorhees where their actions helped place Voorhees in danger.

Taylor argues that there is no evidence that anyone other than Voorhees attempted to reenter the Lodholms' home so that a duty to render aid to Voorhees did not arise. But even if Taylor's argument were supported by the evidence,[5] he overlooks the evidence that Voorhees reentered the Lodholms' home in furtherance of the intruders' robbery scheme. The evidence that Voorhees reentered the home in order to retrieve evidence incriminating to all three intruders supports the conclusion that Taylor and Wilson helped to place Voorhees in danger. *See Morgan*, 86 Wn. App. at 76-77, 81. Thus, Wilson and Taylor had a duty to render aid.

2.    FAILURE TO RENDER AID

Next, Wilson and Taylor contest the sufficiency of the evidence that they actually failed to render aid to Voorhees. Again, we reject this argument.

Wilson, Taylor, and Voorhees reentered the Lodholms' home to retrieve incriminating evidence against each of them. The State introduced evidence that after leaving the Lodholms' home, Wilson and Taylor drove Voorhees to an apartment complex in Federal Way, despite there being at least one hospital near the Lodholms' home. During the drive, Voorhees cried out in pain

---

[5] In fact, Harry testified that all three intruders reentered his home.

17

from his wounds and begged Wilson and Taylor to keep speaking to him. Wilson and Taylor did not take Voorhees to a hospital because they feared questioning.

Voorhees bled to death from his wounds within approximately an hour. According to Voorhees's girlfriend, Wilson told her that Voorhees was already dead when he and Taylor left him in Federal Way. It was only after abandoning Voorhees's corpse that Wilson called 911. There was evidence that with prompt medical attention, Voorhees could have survived his injuries.

Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the State, a rational trier of fact could have found that Wilson and Voorhees breached their duty to summon aid for Voorhees when they drove him to Federal Way and dropped him in an apartment parking lot instead of seeking medical attention at a nearby hospital. This breach of the duty to render aid constitutes recklessness. *Morgan*, 86 Wn. App. at 81. Accordingly, there is sufficient evidence to support their first degree manslaughter convictions (count I).

We also reject Wilson's and Taylor's argument that the trial court erred when it denied their motion to dismiss the first degree manslaughter charges for insufficient evidence because there was sufficient evidence to support the first degree manslaughter convictions (count I). We affirm their manslaughter convictions.

D.  FIREARM AND DEADLY WEAPON SENTENCING ENHANCEMENTS (COUNTS I-XI)

Wilson and Taylor argue that there is insufficient evidence to support any of their firearm sentencing enhancements because there was no evidence that a firearm was present. Taylor argues that "there [i]s insufficient evidence the defendants were 'armed'" because the "'nexus between the defendant, the weapon, and the crime' . . . is not present." Reply Br. of Appellant at 2 (quoting *State v. Eckenrode*, 159 Wn.2d 488, 493, 150 P.3d 1116 (2007)).

18

We agree with Wilson and Taylor that the evidence is insufficient to support the manslaughter convictions' firearm sentencing enhancements. However, we hold that the evidence is sufficient to support the remaining firearm sentencing enhancements.[6]

1.    LEGAL PRINCIPLES

A firearm sentencing enhancement applies "if the offender or an accomplice was armed with a firearm as defined in RCW 9.41.010." Former RCW 9.94A.533(3) (2013). Where a defendant challenges the sufficiency of the evidence that he was "armed" to support his firearm sentencing enhancement, "the State must show that '[he] [wa]s within proximity of an easily and readily available [firearm] for offensive or defensive purposes and [that] a nexus is established between the defendant, the weapon, and the crime.'" *State v. Houston-Sconiers*, 188 Wn.2d 1, 17, 391 P.3d 409 (2017) (internal quotation marks omitted) (third alteration in original) (quoting *State v. O'Neal*, 159 Wn.2d 500, 503-04, 150 P.3d 1121 (2007)). There is sufficient evidence of a nexus where there is a close proximity between the defendant and the firearm at the relevant time and "'[s]o long as the facts and circumstances support an inference of a connection between the weapon, the crime, and the defendant.'" *Houston-Sconiers*, 188 Wn.2d at 17 (quoting *State v. Easterlin*, 159 Wn.2d 203, 210, 149 P.3d 366 (2006)). The "'mere presence'" of a firearm at a crime scene, however, is not enough to establish a nexus. *State v. Brown*, 162 Wn.2d 422, 432, 173 P.3d 245 (2007) (quoting *State v. Schelin*, 147 Wn.2d 562, 570, 55 P.3d 632 (2002) (plurality opinion)).

---

[6] In doing so, we note that second degree assault of Janice with a knife (count XI) was subject to a *deadly weapon* enhancement.

2.      FIRST DEGREE MANSLAUGHTER (COUNT I) FIREARM SENTENCING ENHANCEMENT

Wilson and Taylor argue that there is insufficient evidence of a nexus between a defendant, a firearm, and the first degree manslaughter of Voorhees (count I) to support the firearm sentencing enhancement on that count. In response, the State asserts that it is a reasonable inference that the intruders retained the firearm when they fled the scene and thus that the State proved "the nexus of the gun to the defendants, and the gun to the crime." Br. of Resp't at 13. We agree with Wilson and Taylor and reverse the firearm sentencing enhancements on their manslaughter convictions.

Wilson and Taylor were each found guilty of first degree manslaughter for Voorhees's death, with their convictions subject to firearm sentencing enhancements. At trial, the State introduced evidence that the intruders used a firearm—likely a revolver—to shoot the Lodholms' front door before they reentered the home. But the intruders' firearm was not found. Viewing the evidence in the light most favorable to the State, it is a reasonable inference from the State's evidence that the intruders retained the firearm when they fled the scene. But the State had to prove more than simply that the intruders kept the firearm: the State had to prove a nexus—a "connection"—between the firearm, the defendants, and the manslaughter. *See Houston-Sconiers*, 188 Wn.2d at 17.

The circumstances here are similar to those in *Brown*, where the Supreme Court held that the nexus test was not satisfied. 162 Wn.2d at 432. In *Brown*, evidence that burglars had moved a weapon in the victim's home during the burglary was insufficient to support a firearm enhancement. 162 Wn.2d at 432. Importantly, although the burglars had handled the weapon at some point during the burglary, this was insufficient to establish the requisite nexus. *Brown*, 162

20

Wn.2d at 432-33. The facts suggested that the weapon was "merely loot" and not present to use. *Brown*, 162 Wn.2d at 434-35.

As in *Brown*, here, the facts suggest—at best—that the weapon was merely taken with the intruders in their flight to avoid leaving behind evidence of the crime. However, no evidence or reasonable inference from the evidence establishes that the weapon was present to be used or somehow connected to the commission of the manslaughter of Voorhees, which was based on the breach of the duty to render aid. *See Brown*, 162 Wn.2d at 434-35. Accordingly, although the State likely established that Wilson and Taylor were "'within proximity of an easily and readily available [firearm] for offensive or defensive purposes,'" we hold that the State failed to prove a nexus between either defendant, the weapon, and the manslaughter. *Houston-Sconiers*, 188 Wn.2d at 17 (internal quotation marks omitted) (quoting *O'Neal*, 159 Wn.2d at 503-04). Thus, we reverse the firearm sentencing enhancement on Wilson's and Taylor's manslaughter convictions (count I).

3.    SECOND DEGREE ASSAULT (COUNTS IX AND X) FIREARM SENTENCING ENHANCEMENTS

Wilson and Taylor also argue that there is insufficient evidence to support the firearm sentencing enhancements on the two second degree assault counts (counts IX-X) that were merged into the robbery counts. Taylor specifically argues that Harry's testimony that he was hit on the head by a gun and Janice's testimony that she saw a revolver do not support a conclusion that the intruders were armed during these second degree assaults. We disagree.

Wilson and Taylor were each charged with three counts of second degree assault under RCW 9A.36.021(1)(c)[7]: count IX for intentionally assaulting Harry with a deadly weapon, count

---

[7] "A person is guilty of assault in the second degree if [he], under circumstances not amounting to assault in the first degree . . . [a]ssaults another with a deadly weapon." RCW 9A.36.021(1)(c).

21

X for intentionally assaulting Janice with a deadly weapon, and count XI for intentionally assaulting Janice with a deadly weapon, "to-wit: a knife." CP at 419, 920. Counts IX and X were subject to firearm sentencing enhancements. The jury found Wilson and Taylor guilty of these counts as charged, including the related firearm sentencing enhancements.

Related to count IX's and X's firearm sentencing enhancements, the State's evidence was that on the evening of the home invasion, the intruders forced themselves into the Lodholms' home when Harry answered the front door. An intruder forced Harry to the floor, struck him twice with the butt of a pistol, and demanded marijuana, gold, and money. The gun-wielding intruder threatened to shoot Harry and held a gun against his head.

The gun-wielding intruder then ordered another intruder, who had a knife, to "'[g]o get the wife.'" 3 RP at 209. The intruder with the knife retrieved Janice from the bathroom, cutting her hand and punching her, and dragged her to the living room where she, too, was held at gunpoint. Janice remembered the armed intruder pointing a "gun with a long barrel" at her. 4 RP at 283. While Harry and Janice were tied up and the intruders ransacked their home, one intruder said to "'[j]ust shoot her in the head, shoot her in the head now'" and another replied, "'No, not yet.'" 3 RP at 214-15.

Taken in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that the perpetrator of each count or his accomplice was "armed" during the second degree assaults. Related to the firearm sentencing enhancement for second degree assault of Harry (count IX), the evidence showed that the gun-wielding intruder who assaulted Harry not only threatened to shoot Harry but also held a pistol against his head. This evidence is sufficient to show both proximity and a nexus between the firearm, this second degree assault, and

22

the intruder. *See Houston-Sconiers*, 188 Wn.2d at 17. Similarly, for the second degree assault of Janice with a firearm (count X), the evidence showed that an intruder held Janice at gunpoint and that one intruder subsequently said to just "'shoot her.'" 3 RP at 214. This evidence is sufficient to show that an intruder or his accomplice was "armed" for the purposes of this enhancement. *See Houston-Sconiers*, 188 Wn.2d at 17.

We hold that there is sufficient evidence to support the firearm sentencing enhancements on the second degree assault counts IX and X.

4.    FIRST DEGREE ROBBERIES, FIRST DEGREE KIDNAPPINGS, AND FIRST DEGREE BURGLARY
       (COUNTS IV TO VIII) FIREARM SENTENCING ENHANCEMENTS

Taylor and Wilson argue that there is insufficient evidence to support firearm enhancements for the first degree robbery, first degree kidnapping, and first degree burglary convictions (counts IV-VIII). Taylor and Wilson assert that "if the Defendants had an operable firearm while inside the home, it would be more likely that they would have clearly flaunted it to the alleged victims in order to enhance the threat." Br. of Appellant Taylor at 5-6. We reject these arguments.

Wilson and Taylor were each charged with two counts of first degree robbery (counts IV-V), two counts of first degree kidnapping (counts VI-VII), and one count of first degree burglary (count VIII); all five counts were subject to firearm sentencing enhancements. The jury found Wilson and Taylor guilty of each count as charged, including the related firearm sentencing enhancements.

The State introduced evidence that while Harry and Janice were tied near each other on their living room floor, the intruders ransacked their home for valuables. Harry and Janice testified that the intruders had struck Harry with the gun, threatened to shoot Harry after demanding his

23

marijuana, gold, and money, and held Harry and Janice at gunpoint before tying them up. The intruders also fired a shot into the front door when they reentered the home.

Taylor's argument overlooks that "clearly flaunt[ing]" the firearm during the robberies, kidnappings, and burglaries is precisely what the intruders did. Br. of Appellant at 6. Taylor's argument also overlooks that there is a reasonable inference that the firearm used to shoot the front door was the same firearm used to threaten the Lodholms. Viewed in the light most favorable to the State, the facts and reasonable inferences therefrom are sufficient for a rational jury to find that one of the intruders not only had a firearm easily accessible and readily available for use but in fact used a firearm during the robberies, kidnappings, and burglary. Thus, the jury could find a connection between the intruder, the weapon, and the robberies, kidnappings, and burglary. *See Houston-Sconiers*, 188 Wn.2d at 17. Sufficient evidence supports the firearm sentencing enhancements on these counts.

5.    FIRST DEGREE ASSAULT (COUNTS II AND III) FIREARM SENTENCING ENHANCEMENTS

Finally, Wilson and Taylor argue that there is insufficient evidence to support the firearm sentencing enhancements on their convictions for first degree assault of Harry and Janice (counts II-III). These arguments fail.

Wilson and Taylor were charged with two counts of first degree assault (one each for Harry and Janice) with firearm sentencing enhancements (counts II-III). The jury found both defendants guilty of the first degree assaults and related enhancements as charged.

The State's evidence was that after returning and finding the front door shut and locked from the inside, the intruders "bashed into the door" and window and fired a shot into the door. 3

24

RP at 216. Officers subsequently found a bullet lodged into the front door. And Voorhees's girlfriend testified that Voorhees had shot at the door, according to Wilson's account.

This evidence, viewed in the light most favorable to the State, is sufficient for a rational jury to find beyond a reasonable doubt both that the intruders were in proximity to a firearm when the first degree assaults were committed and to find a nexus between the firearm used to shoot the front door, one of the intruders, and the first degree assaults. *See Houston-Sconiers*, 188 Wn.2d at 17. We affirm the firearm sentencing enhancements on the first degree assaults (counts II-III).

## II. FAILURE TO INSTRUCT ON THE DUTY TO RENDER AID

Wilson separately argues that the trial court should have instructed the jury that it had to find that Wilson had a duty to render aid to Voorhees in order to convict Wilson of manslaughter (count I). We reject Wilson's argument.

We review de novo whether a trial court erred as a matter of law when it refused to give a requested instruction. *State v. Read*, 147 Wn.2d 238, 243, 53 P.3d 26 (2002).

Here, the trial court gave the WPICs on manslaughter and proximate cause:

> [Instruction 9] A person commits the crime of manslaughter in the first degree when he or she recklessly causes the death of another person.

CP at 660; *see* WPIC 28.01.

> [Instruction 13] To constitute manslaughter, there must be a causal connection between the criminal conduct of a defendant and the death of a human being such that the defendant's act or omission was the proximate cause of the resulting death.
> The term "proximate cause" means a cause which, in a direct sequence, unbroken by any new independent cause, produces the death, and without which the death would not have happened.
> There may be more than one proximate cause of a death.

25

CP at 664; *see* WPIC 25.02. The trial court also gave the WPIC to-convict instruction, which required that the jury find beyond a reasonable doubt that (1) Wilson or an accomplice "engaged in a reckless act or omission," (2) "Voorhees died as a result of this reckless act or omission," and (3) the acts occurred in Washington. CP at 666; *see* WPIC 28.02.

Wilson sought to have the jury instructed that it had to find beyond a reasonable doubt that Wilson had a duty to summon aid that arose under the circumstances. Wilson proposed a jury instruction purportedly derived from the holding of *Morgan*. The proposed instruction read, "A person generally has no duty to render or summon medical aid to an injured person. However a duty to render or summon medical aid exists if the Defendant's actions create or *increase the risk of injury to the person injured*." CP at 1074 (emphasis added).

A. JURY INSTRUCTION NOT A CORRECT STATEMENT OF THE DUTY TO RENDER AID

We first determine whether Wilson's proposed jury instruction correctly stated the law. Wilson relied upon *Morgan* as authority for his proposed instruction. In that case, Division Three held that the trial court properly denied a motion to dismiss a manslaughter charge because the State had proved that Morgan "recklessly fail[ed] to provide prompt medical treatment for his wife." *Morgan*, 86 Wn. App. at 79.

The *Morgan* court analyzed a California case, *People v. Oliver*, 210 Cal. App. 3d 138, 258 Cal. Rptr. 138 (1989), that examined the circumstances under which a duty to summon medical aid exists:

> California has found that a duty to summon medical aid exists if a person creates or increases the risk of injury to another. [*Oliver*, 210 Cal. App. 3d 138]. In *Oliver*, the court upheld a manslaughter conviction for a defendant who took her extremely intoxicated ex-husband home, helped him use heroin, dragged him behind her house after finding him unconscious and allowed him to die without medical assistance. The court found the defendant's behavior created an unreasonable risk

26

> of harm and a duty to prevent that risk from occurring by summoning aid. Her failure to summon any medical assistance breached that duty and made her responsible for his death. [*Oliver*, 210 Cal. App. 3d at 144]. Under the ruling in *Oliver*, it would not matter that the Morgans were involved in the commission of a felony as Mr. Morgan alleges because his duty to summon medical help would exist due to his helping place her in the position of needing aid.

*Morgan*, 86 Wn. App. at 80-81. The *Morgan* court concluded that Morgan had a statutory duty to provide medical care, a natural duty to his wife, and "a duty to summon aid for someone he helped place in danger." 86 Wn. App. at 81. Because his "violation of this duty amounted to recklessness," the trial court had properly denied Morgan's motion to dismiss the manslaughter charge. *Morgan*, 86 Wn. App. at 81.

Wilson's proposed jury instruction was only a partially accurate statement of *Morgan*'s holding. Although *Morgan* does hold that a duty to summon medical aid arises when one places another in the position of needing aid, *Morgan* does not hold that a duty to summon aid arises when one subsequently increases the risk of injury to another. *See* 86 Wn. App. at 80-81. *Oliver* states that increasing the risk of injury to another creates a duty to summon aid; however, as the excerpt from *Morgan* shows, *Morgan* did not adopt that portion of *Oliver*'s holding. 86 Wn. App. at 81. Accordingly, Wilson's proposed jury instruction inaccurately stated Washington law when it said that "a duty to render or summon medical aid exists if the Defendant's actions create *or increase the risk of injury* to the person injured." CP at 1075 (emphasis added); *see Morgan*, 86 Wn. App. at 81.

Wilson provides no other Washington case that holds that increasing the risk of injury to a person can be the basis for a duty to summon medical aid to arise. Accordingly, we hold that Wilson's proposed jury instruction inaccurately stated the law and thus that the trial court properly refused to give that instruction.

27

## B. EVEN IF ACCURATE, NOT REQUIRED

We next examine whether even assuming Wilson's instruction properly stated Washington law, the trial court correctly refused to give the instruction. "[L]anguage from appellate court decisions should not necessarily be incorporated into jury instructions." *State v. Summers*, 107 Wn. App. 373, 387, 28 P.3d 780 (2001). None of the three cases that Wilson cites as support to argue that violation of a duty can be evidence of recklessness actually required that a jury be instructed that it had to find a duty had arisen in order to convict the defendant. *See* Br. of Appellant Wilson at 11 (citing *Morgan*, 86 Wn. App. at 79-80; *State v. Norman*, 61 Wn. App. 16, 26, 808 P.2d 1159 (1991); *State v. Williams*, 4 Wn. App. 908, 915, 484 P.2d 1167 (1971)).[8]

For example, in *Norman*, the defendant argued that his manslaughter conviction for refusal to provide medical care for his diabetic son should be reversed due to error in the jury instructions. 61 Wn. App. at 18, 20. The defendant challenged the jury instruction that stated,

> "You are instructed that a parent has a duty to provide medical care for a dependent child. The duty is activated at the time when an ordinarily prudent person, solicitous for the welfare of his or her child and anxious to promote its recovery, would deem it necessary to call in medical assistance. If this duty is breached the breach must be shown to be reckless, or criminal negligence, as defined in these instructions, to support first or second degree manslaughter respectively."

*Norman*, 61 Wn. App. at 24 n.6.

Importantly, in upholding the trial court's decision to give the quoted instruction, Division Three observed that the defendant had testified in his defense that he had "a perceived duty to church and God" that excused his actions. *Norman*, 61 Wn. App. at 25. The first sentence of the

---

[8] *Morgan*, as discussed, involved the denial of a defense motion to dismiss and did not mention the jury instructions. *See* 86 Wn. App. 74. And *Williams* involved a bench trial and does not discuss jury instructions either. *See* 4 Wn. App. 908.

instruction accurately stated that the defendant also had a duty to his child. *Norman*, 61 Wn. App. at 25. The remainder of the instruction properly advised the jury that "a reckless act" or "a criminally negligent act" was required to convict the defendant of manslaughter. *Norman*, 61 Wn. App. at 25. Thus, although Division Three upheld the giving of an instruction that discussed the duty to provide medical care for a child, at no point did Division Three endorse the notion that in cases involving manslaughter by failure to act, the jury must be instructed about the circumstances under which an affirmative duty arises. *See Norman*, 61 Wn. App. at 24-25.

Wilson fails to provide any authority that in a manslaughter case where liability is premised on failure to act, the jury *must* be instructed on duty. Thus, even assuming that Wilson's instruction correctly stated the law, the trial court did not err when it refused to give the instruction.

## C.  NO PREJUDICE

Finally, we look to whether the failure to give Wilson's proposed instruction prejudiced Wilson. "The refusal to give instructions on a party's theory of the case . . . is reversible error *when it prejudices a party.*" *State v. Werner*, 170 Wn.2d 333, 337, 241 P.3d 410 (2010) (emphasis added). "[I]t is not error for a trial court to refuse a specific instruction when a more general instruction adequately explains the law and allows each party to argue its case theory." *State v. Hathaway*, 161 Wn. App. 634, 647, 251 P.3d 253 (2011).

Here, Wilson's theory was that it was Voorhees's actions in reentering the Lodholms' house that caused his death. And Wilson further argued that even with medical attention, Voorhees would likely have died within minutes. Wilson also argued that there was no evidence that it was Wilson who decided not to go to the hospital.

If the portion of Wilson's instruction that properly stated *Morgan* had been given, Wilson would have argued that he did not create the danger to Voorhees, so that no duty to summon aid arose. But this is precisely what Wilson argued in closing. Accordingly, even if we assumed that Wilson's proposed instruction properly stated the law and that he showed the instruction was required, Wilson cannot show that he suffered prejudice from the failure to give his proposed instruction. For these reasons, we reject Wilson's arguments related to failure to give his proposed instruction and affirm his manslaughter conviction.

### III.  DOUBLE JEOPARDY AND MERGER

Relying upon *State v. Freeman*, 153 Wn.2d 765, 108 P.3d 753 (2005), Wilson and Taylor argue that their convictions for the knife assault of Janice (count XI) and the first degree robbery of Janice (count V) violated double jeopardy. They argue that the trial court violated the prohibition against double jeopardy because it should have merged the conviction for the knife assault of Janice (count XI) into the conviction for the first degree robbery of Janice (count V). We disagree with them.

We hold that under the merger doctrine, the knife assault (count XI) does not merge with the first degree robbery (count V). *Freeman* holds that second degree assault and first degree robbery merge where "without the conduct amounting to assault," the defendant would be guilty of only second degree robbery. 153 Wn.2d at 778. But convictions do not merge where there are multiple convictions of second degree assault, one conviction of first degree robbery, and only one of the second degree assault convictions was necessary to elevate the robbery to the first degree. *State v. Chesnokov*, 175 Wn. App. 345, 355, 305 P.3d 1103 (2013). Here, because one of the second degree assaults (count X) was merged with the first degree robbery (count V), it does not

violate the merger doctrine for Wilson and Taylor to be separately convicted of second degree assault under count XI.

## A.  LEGAL PRINCIPLES

We review de novo whether multiple convictions arising out of the same offense offend double jeopardy.  *Freeman*, 153 Wn.2d at 770.  In *Freeman*, our Supreme Court determined that convictions for first degree robbery and second degree assault arising out of the same incident—punching a woman in the face and then taking cash and casino chips from her—violated double jeopardy principles.  153 Wn.2d at 770, 778.

The *Freeman* court explained that double jeopardy is not necessarily offended where one act violates multiple criminal statutes, if the legislature intended that a defendant be convicted of separate crimes for the same conduct.  153 Wn.2d at 768.  *Freeman* began by outlining a three-part inquiry to determine whether multiple convictions offend double jeopardy:  (1) legislative intent, (2) if no legislative intent for separate punishment is clear, the *Blockburger*[9] test, and (3), if applicable, the merger doctrine.  153 Wn.2d at 771-73; *see also State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008) (stating the inquiry is a "three-part test").

After determining that (1) and (2) were not dispositive of the double jeopardy analysis, the court applied the merger doctrine.  *Freeman*, 153 Wn.2d at 773-78.  Under (3), the merger doctrine, the *Freeman* court held that the first degree robbery and second degree assault should merge.  153 Wn.2d at 770, 780.  "Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish

---

[9] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 2d 306 (1932).

both offenses through a greater sentence for the greater crime." *Freeman*, 153 Wn.2d at 772-73. The merger doctrine applied to the second degree assault because "to prove first degree robbery as charged and proved by the State, the State had to prove the defendant[] committed an assault in furtherance of the robbery." *Freeman*, 153 Wn.2d at 778. Indeed, "[g]enerally, it appears that [second degree assault and first degree robbery] will merge unless they have an independent purpose or effect." *Freeman*, 153 Wn.2d at 780.

The Supreme Court provided further guidance on the application of the merger doctrine to second degree assault and first degree robbery in *Kier*, where it "set side by side" the definitions of first degree robbery and second degree assault as charged. 164 Wn.2d at 806.

> [B]oth charges required the State to prove that Kier's conduct created a reasonable apprehension or fear of harm. Because Kier was also charged with being armed with or displaying a deadly weapon, this was the means of creating that apprehension or fear. . . . The merger doctrine is triggered when second degree assault with a deadly weapon elevates robbery to the first degree because being armed with or displaying a firearm or deadly weapon to take property through force or fear is essential to the elevation.

*Kier*, 164 Wn.2d at 806.

In *Chesnokov*, the defendant was charged with one count of first degree robbery and three counts of second degree assault arising out of the robbery of an AT&T store, where the defendant and his accomplice held employees at gunpoint. 175 Wn. App. at 347-48. The trial court refused to merge the second degree assaults with the robbery, and on appeal, the defendant argued that it was error not to merge two of his assault convictions into his first degree robbery conviction. *Chesnokov*, 175 Wn. App. at 348.

32

Division One held that it was error under *Kier* not to merge *one* of the assaults with the robbery under the merger doctrine. *Chesnokov*, 175 Wn. App. at 356. But as to the remaining count,

> only one of those convictions was essential to elevate robbery to the first degree. It does not violate the merger doctrine for Chesnokov to be punished for the remaining assault count where the State has proven two counts and one of those counts merges with the robbery conviction. The second conviction was not essential and does not merge.

*Chesnokov*, 175 Wn. App. at 355.

### B. Merger Doctrine Does Not Require Merger of Knife Assault (Count XI) into Robbery (Count V)

Here, neither Wilson and Taylor nor the State asks us to diverge from *Freeman*'s double jeopardy analysis under (1) and (2). Accordingly, we focus upon whether the merger doctrine applies and if so, whether the exception for an offense with an independent purpose or effect applies. *See Kier*, 164 Wn.2d at 805 n.1 (analyzing only the applicability of the merger doctrine where neither party suggested that the analysis under steps (1) and (2) would differ from *Freeman*).

To prove the second degree assault with a knife (count XI) the State had to prove a defendant "was armed with a deadly weapon at the time of the commission of the crime in" count XI. CP at 735. To prove second degree assault with a firearm (count X), the State had to prove a defendant "was armed with a firearm at the time of the commission of the crime" in count X. CP at 734.

To prove that Taylor or Wilson were guilty of *first degree* robbery of Janice (count V), the State had to prove that during the robbery or subsequent flight, the defendant was either (1) armed with a deadly weapon, (2) displayed what appeared to be a firearm or other deadly weapon, or (3) inflicted bodily injury. RCW 9A.56.200. The evidence showed that after the intruders entered the

home, they used a knife to assault Janice in the bathroom and subsequently threatened Janice at gunpoint in the living room. Either the use of a deadly weapon in the knife assault (count XI) or the use of a firearm in the firearm assault (count X) could have been the basis to elevate the robbery (count V) to *first degree* robbery.

The application of the merger doctrine to this case is similar to *Chesnokov* and distinct from *Freeman*. As in *Chesnokov*, it does not violate the merger doctrine for Wilson and Taylor to be punished for the remaining second degree assault of Janice (count XI) where the second degree assault with a firearm (count X) was merged with the robbery conviction (count V). *See* 175 Wn. App. at 355. Just as in *Chesnokov*, only one of the second degree assaults "was essential to elevate robbery to the first degree." 175 Wn. App. at 355. Thus, the other second degree assault (count XI) is not essential and does not merge. *See Chesnokov*, 175 Wn. App. at 355.

This situation is distinct from *Freeman* because, unlike in *Freeman*, it cannot be said here that "without the conduct amounting to assault" that formed the basis for the knife assault (count XI), Wilson and Taylor "would be guilty of only second degree robbery." 153 Wn.2d at 778. Rather, the conduct underlying the *assault with a firearm* (count X)—"intentionally assault[ing] [Janice] with a deadly weapon," in the commission of which the defendant or an accomplice "was armed with a firearm"—would nevertheless have elevated the robbery of Janice (count V) to first degree robbery. CP at 920.

We hold that the merger doctrine does not require that the knife assault against Janice (count XI) be merged with the conviction for first degree robbery of Janice (count V). Accordingly

34

we reject Wilson's and Taylor's arguments that separate convictions for the knife assault against Janice (count XI) and the first degree robbery of Janice (count V) violated double jeopardy.[10]

## IV. SAME CRIMINAL CONDUCT

The parties dispute whether the trial court abused its discretion when it ruled that none of Wilson's and Taylor's crimes arose from the same criminal conduct. We hold that for each defendant, the trial court properly found that the manslaughter (count I) and first degree assault (count II) were not the same criminal conduct as any other crimes. In addition, assuming but not deciding that any other error occurred in the same criminal conduct determination, it was harmless under *State v. Bobenhouse*, 166 Wn.2d 881, 896-97, 214 P.3d 907 (2009).

## A. LEGAL PRINCIPLES

Crimes form the same criminal conduct if they require the same criminal intent, are committed at the same time and place, and involve the same victim. RCW 9.94A.589(1)(a).[11] "A determination of 'same criminal conduct' at sentencing affects the standard range sentence by altering the offender score." *State v. Graciano*, 176 Wn.2d 531, 535, 295 P.3d 219 (2013).

The determination that crimes do not form the same criminal conduct also affects whether sentences run consecutively or concurrently. At sentencing, the general rule is that sentences for multiple current offenses run concurrently. *State v. Weatherwax*, 188 Wn.2d 139, 142, 392 P.3d 1054 (2017). However, an exception in RCW 9.94A.589(1)(b) provides that sentences for serious

---

[10] Because the merger doctrine is not violated, we do not reach the "independent purpose or effect" test. *Freeman*, 153 Wn.2d at 780.

[11] The legislature amended RCW 9.94A.589(1)(a), (c), and (d) effective April 2015. LAWS OF 2015, ch. 134, § 2. Because these amendments are not relevant to our analysis, we cite to the current version of the statute.

violent offenses arising from separate and distinct criminal conduct run consecutively. *Weatherwax*, 188 Wn.2d at 142. That is, when a trial court sentences a person convicted of multiple serious violent offenses arising from separate and distinct criminal conduct,

> the standard sentence range for the offense with the highest seriousness level under RCW 9.94A.515 shall be determined using the offender's prior convictions and other current convictions that are not serious violent offenses in the offender score and the standard sentence range for other serious violent offenses shall be determined by using an offender score of zero. The standard sentence range for any offenses that are not serious violent offenses shall be determined according to (a) of this subsection. All sentences imposed under this subsection (1)(b) shall be served consecutively to each other and concurrently with sentences imposed under (a) of this subsection.

RCW 9.94A.589(1)(b). It is well established that to determine whether criminal conduct is "separate and distinct" for RCW 9.94A.589(1)(b) to apply, we look to whether the crimes constituted the same criminal conduct under RCW 9.94A.589(1)(a). *State v. Cubias*, 155 Wn.2d 549, 552, 120 P.3d 929 (2005).

## B. ANALYSIS

1. *STATE V. BOBENHOUSE*

Under *Bobenhouse*, we look to whether the result of the same criminal conduct determination could have impacted Taylor's or Wilson's sentences by changing the offender scores for their convictions.[12] *See* 166 Wn.2d at 896-97. In *Bobenhouse*, the defendant argued that the sentencing court erred in calculating his offender score when it did not count his crimes as the same criminal conduct. 166 Wn.2d at 896. The defendant was given an aggravated exceptional

---

[12] Because the firearm and deadly weapon enhancements were mandatory regardless of the same criminal conduct determination, *State v. Mandanas*, 168 Wn.2d 84, 89-90, 228 P.3d 13 (2010), we ignore the enhancements for purposes of this analysis.

sentence based upon the fact that he had committed multiple current offenses but that his offender score was so high that some of the current offenses went unpunished. *Bobenhouse*, 166 Wn.2d at 896; *see* RCW 9.94A.535(2).

The Supreme Court specifically held any error resulting in miscalculating the offender score was harmless. *Bobenhouse*, 166 Wn.2d at 896-97. The court concluded that even if the defendant's current offenses were the same criminal conduct, his offender score would have remained greater than nine, and thus some of the defendant's crimes would still go unpunished without an exceptional sentence being imposed. *Bobenhouse*, 166 Wn.2d at 896-97.

We apply the reasoning from *Bobenhouse*: we look to how Taylor's and Wilson's sentences were calculated and whether error in the finding that none of the crimes constituted the same criminal conduct affected those sentences.[13]

2.    APPLICATION OF RCW 9.94A.589(1)(b) AND CONCLUSION

Here, Taylor and Wilson were both convicted of multiple serious violent offenses: first degree manslaughter (count I), first degree assault (counts II-III), and first degree kidnapping (counts VI-VII). *See* former RCW 9.94A.030(44) (2012). RCW 9.94A.589(1)(b) applied to any

---

[13] For reference, the relevant sentencing data was as follows:

| Count | Offender Score (Wilson) | Offender Score (Taylor) | Seriousness Level | Sentence |
|---|---|---|---|---|
| I: First Degree Manslaughter | 0 | 0 | XI | 102 months |
| II: First Degree Assault | 9+ | 13.5 | XII | 0 |
| III: First Degree Assault | 0 | 0 | XII | 0 |
| IV: First Degree Robbery | 9+ | 21.5 | IX | 0 |
| V: First Degree Robbery | 9+ | 21.5 | IX | 0 |
| VI: First Degree Kidnapping | 0 | 0 | X | 0 |
| VII: First Degree Kidnapping | 0 | 0 | X | 0 |
| VIII: First Degree Burglary | 9+ | 21.5 | VII | 0 |
| IX: Second Degree Assault | 9+ | 21.5 | IV | 0 |
| X: Second Degree Assault | 9+ | 21.5 | IV | 0 |
| XI: Second Degree Assault | 9+ | 21.5 | IV | 0 |

of these offenses that arose from separate and distinct criminal conduct and were not part of the same criminal conduct as the other offenses. *See Cubias*, 155 Wn.2d at 552.

The trial court determined that none of the crimes arose from the same criminal conduct, so it applied RCW 9.94A.589(1)(b) to all the serious violent offenses. For our purposes, we are concerned with only the manslaughter (count I) and the first degree assaults (counts II-III).

The manslaughter (count I) involved a different victim, Voorhees, from any of the other offenses. Accordingly, the manslaughter (count I) was separate and distinct criminal conduct from any of the other offenses. *See* RCW 9.94A.589(1)(a) (crimes must be committed against the same victim to be same criminal conduct). The first degree assaults (counts II-III) occurred after the intruders left the home and reentered it, so that they too could not form the same criminal conduct as any of the other offenses. *See* RCW 9.94A.589(1)(a) (crimes must be committed at the same time and place to be same criminal conduct). The trial court properly applied RCW 9.94A.589(1)(b) to the manslaughter and first degree assault charges (counts I-III).[14]

The second step under RCW 9.94A.589(1)(b) is to calculate the offender score for the offense with the highest seriousness level "using the offender's prior convictions and other current convictions that are not serious violent offenses in the offender score." For both Wilson and Taylor, the first degree assault convictions (counts II-III) had the highest seriousness level, "XII," out of all the convictions. The trial court gave Wilson and Taylor "9+" and "13.5" offender scores, respectively, for their first degree assault conviction (count II).[15]

---

[14] Under the circumstances of this case and as set forth below, whether or not the kidnappings (counts VI-VII) were separate and distinct from the remaining convictions is immaterial.

[15] The trial court assigned an offender score of "0" to the other first degree assault (count III) which had the same seriousness level as count II.

The third step is to use an offender score of zero for the other serious violent offenses arising from separate and distinct criminal conduct. RCW 9.94A.589(1)(b). Here, the trial court gave the manslaughter (count I) an offender score of "0" based upon the application of RCW 9.94A.589(1)(b).

After applying RCW 9.94A.589(1)(b) as set forth above, the trial court sentenced Wilson and Taylor to standard range sentences of 102 months incarceration on count I (manslaughter), exceptional sentences downward of "0" months incarceration on all the remaining counts, and sentencing enhancements on each count. Importantly for purposes of our analysis, the trial court *imposed incarceration time on only the manslaughter convictions* (count I) in addition to the sentencing enhancements.

Throughout this analysis, we have focused on the manslaughter and first degree assault convictions (counts I-III) and not the remaining counts (IV-V, VIII-XI). This is so because the same criminal conduct determination related to those counts simply had no effect on Wilson's and Taylor's incarceration time.

The determination that the kidnappings (counts VI-VII) were not the same criminal conduct meant that the kidnappings' sentences ran consecutively to the sentences on the manslaughter and first degree assaults (counts I-III) and concurrently to the remaining counts (IV-V, VIII-XI). *See* RCW 9.94A.589(1)(b). But this did not increase Wilson's or Taylor's incarceration time because they received exceptional sentences downward of "0" on the kidnappings (counts VI-VII).

The determination that none of the remaining counts—the nonserious violent offenses—were the same criminal conduct also did not affect Wilson's and Taylor's incarceration time. Had any of these offenses arisen from the same criminal conduct, they would have been "counted as one crime" when calculating the offender scores for the first degree assault (count II) and the nonserious violent offenses (counts IV-V, VIII-XI). *See* RCW 9.94A.589(1)(a)-(b). But lowering any of these crimes' offender scores would not have affected Wilson's or Taylor's incarceration time because Wilson and Taylor received "0" month sentences on the nonserious violent offenses (counts IV-V, VIII-XI).

As set forth above, the only way in which the same criminal conduct determination could affect Wilson and Taylor was if that determination affected the manslaughter's (count I) offender score. The trial court's ruling that the manslaughter (count I) and the offense with the highest seriousness level, first degree assault (count II), arose from separate and distinct criminal conduct as any of the other crimes was correct. Otherwise, the same criminal conduct determination did not affect and was "academic" as to the remaining sentences. RP (March 25, 2016) at 29; *see Bobenhouse*, 166 Wn.2d at 896-97. Under these facts, therefore, any error in the remainder of the trial court's same criminal conduct finding was harmless.

## V. CORRECTION TO JUDGMENTS AND SENTENCES

We also sua sponte address a sentencing error. As the State conceded at oral argument, scrivener's errors in Wilson's and Taylor's judgment and sentences list firearm sentencing

enhancements on the second degree assaults with a knife (count XI) when the knife assaults were charged with and the jury found deadly weapon enhancements. Wash. Court of Appeals oral argument, *State v. Taylor*, No. 48796-9-II (Sept. 7, 2017), at 17 min., 19 sec (on file with court). The judgment and sentences should be corrected to reflect the jury's verdict. We sua sponte remand for correction of the judgment and sentences in this regard.

## VI. APPELLATE COSTS

Wilson requests that we decline an award of appellate costs should the State substantially prevail. The State represents that it may impose appellate costs but that it is "extremely unlikely" that it will do so. Br. of Resp't at 19. We decline to address this issue because a commissioner of this court will determine whether to award appellate costs under RAP 14.2 if the State files a cost bill and if the named appellant objects.

## CONCLUSION

We conclude that there is insufficient evidence to support the firearm sentencing enhancements on the manslaughter convictions (count I), so that these enhancements should be dismissed. We remand to the trial court to correct the judgment and sentences to reflect that for each defendant, a second degree assault with a knife (count XI) was subject to a deadly weapon sentencing enhancement, not a firearm sentencing enhancement.

Consol. Nos. 48796-9-II / 48799-3-II

Affirmed in part and remanded.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

JOHANSON, P.J.

We concur:

LEE, J.

MELNICK, J.